556 So.2d 324 (1990)
MISSISSIPPI Employment Security Commission and Jackson Municipal Separate School District
v.
Deborah V. McGlothin.
No. 07-59080.
Supreme Court of Mississippi, En Banc.
January 10, 1990.
Rehearing Denied February 14, 1990.
*325 Fred J. Lotterhos, Jr., Jackson, for appellant.
Cynthia Ann Stewart, Jackson, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
This case presents the question whether a public school teacher, dismissed for an on-the-job yet unobtrusive expression of her cultural and religious heritage on grounds not compelled by the demands of orderly school administration, may be denied benefits under the Mississippi Employment Security Law. The Mississippi Employment Security Commission (MESC) found the teacher's conduct "misconduct" within the Act and denied her claim. The Circuit Court reversed, holding on the facts found that the teacher's head-wrap was protected expression under the First Amendment. We affirm.

II.

A.
Deborah V. McGlothin was born on August 26, 1953. She lives in Jackson with her four children whom she supports. McGlothin is a member of the original African Hebrew Israelites out of Ethiopia. As an expression of her religious and cultural heritage, McGlothin would at times wear a head-wrap, "especially during times of spiritual growth." In her words,
It's more of a, just a preference, but at, at times when it really became an issue, I was searching for a spiritual growth. And in this spiritual growth because of my teachings of religion and my spiritual being, it became a part of me and is something that I felt that brought me closer to strength.
McGlothin became employed by the Jackson Municipal Separate School District (JMSSD) on August 26, 1983. She was originally assigned to the McLeod Elementary School. She wore a head-wrap from time to time without incident. McGlothin requested a transfer to another school closer to her home, and beginning with the 1985-86 school year the JMSSD assigned her to the Whitfield Elementary School in west Jackson, where she served as an assistant teacher. During that first year Kisiah Nolan, school principal, expressed displeasure at McGlothin's head-wrap.
At the beginning of the 1986-87 school year, Principal Nolan convened the school's shared governance committee[1] which *326 adopted a rule for classroom personnel prohibiting the wearing of headdresses or blue jeans.[2] Nolan then instructed McGlothin to cease wearing her head-wrap. Fearful of losing her job, McGlothin acquiesced for a time, as she has four children to support.
The Jackson Municipal Separate School District has a prominent district-wide educational policy of encouraging multi-cultural diversity and experience. In January of 1987 McGlothin attended a district-wide multi-cultural workshop where this feature of JMSSD's educational mission was emphasized. Her response is described in the record before MESC by District Personnel Director Terry.
A. I have a statement from Ms. McGlothin that indicated that she attended a multi-cultural workshop that was presented by the Jackson Public School District, wherein the district and the board resolved that multi-cultural educations and the exercises that tend to suggest multi-cultural diversity were acceptable and supported by the school system. She indicated in her response that it was after attending that work shop that she resumed wearing the garments of discussion believing that it was the district's position to be more receptive to items of this nature, and that they were her way of expressing the cultural diversity that was not offensive.
February, 1987, was Black History month in JMSSD, as elsewhere. McGlothin testified:
We went right in to Black History Month and I was constantly called on during Black History Month to give my service because of my expertise and knowledge of the African culture, per se, which is being utilized here constantly, on a constant basis. And that I feel very hurt and offended that when the year comes around of Black History Month that I'm called upon to show my expression of Africanist and no one is objectionable to, you know, when I have it on. Ms. Nolan never verbally or any other way said anything other than praise to me of the programs that were presented and she did not mention that the wear was quite appropriate or inappropriate to have this head dress on at this time that I displayed these, these skits relating to the African culture that we speak of. I put on a skit of people who were in the struggle, who of course wore head wraps and I did not display their character myself. This was the way I'd dressed on those particular days as just a program director of the particular skits. And also I displayed the African folk lore and a number of things of that nature, and nothing was ever verbally said to me in objection or any way by Mrs. Nolen until *327 I received in hand, while I was taking the kids to the restroom on that day I was given the memo. Nothing at all was said to me. I was constantly praised and I would hope that I would be judged on the merits of this.
On March 6, 1987, Principal Nolan delivered a written memorandum to McGlothin on March 6, 1987, concerning her "inappropriate dress." Nolan couched the issue in the need for teachers to dress professionally. "All children need positive role models, but especially do elementary-aged children because of their very impressionable young minds. I am concerned that your appearance is giving them a distorted view of what is appropriate." Nolan suggested that McGlothin "take some time [during spring break] to make a decision as to whether you desire to remain at Whitfield Elementary School."
McGlothin refused to discontinue wearing her head-wrap. On March 17, 1987, JMSSD discharged McGlothin for insubordination to her school principal.
Of importance, nothing in the record supports any inference that McGlothin's job performance as an assistant teacher was deficient. JMSSD's Terry reported "McGlothin's work was essentially satisfactory." Moreover, there is no evidence that McGlothin's actions in wearing her head-wrap had any adverse impact on her ability to do her job, nor upon the educational mission of Whitfield Elementary School.

B.
Following her discharge, McGlothin applied for benefits under the Mississippi Employment Security Law. On May 7, 1987, an MESC referee disqualified McGlothin for benefits on grounds of misconduct connected with her work, Miss. Code Ann. § 71-5-513 A(1)(b) (Supp. 1989), and en route found the following facts:
Claimant was employed four years as an assistant teacher with the Jackson Public Schools, Jackson, Mississippi, ending March 17, 1987, when discharged for insubordination. She was discharged because she continued to wear head-wraps after numerous discussions with her advising that her attire was not considered appropriate professional dress for teachers and assistant teachers. The local shared governance committee, comprised of school personnel and parents, had ruled that jeans and head-wraps were inappropriate dress. Claimant wears berets and head dresses as an expression of her religious and cultural heritage. The custom is not dictated by the Ethiopian Culture, but is claimant's preference in expressing her ancestry. Claimant admits she does not wear the head-wrap at all times, but is selective in choosing when to put it on. After prior warnings by the principal, claimant discontinued the practice. She resumed the practice after attending a multi-cultural workshop sponsored by the schools . .. by claimant's own admission, she is selective in wearing the traditional head-wrap which she continued to wear after being warned... .
[Emphasis supplied] The MESC Board of Review affirmed the referee. The Circuit Court of the First Judicial District of Hinds County reversed on the grounds that McGlothin's conduct was protected under the First Amendment free exercise clause. The Court stated:
Here having found that the claimant wears the head dress in question "as an expression of her religion and cultural heritage," the additional finding that the practice is not mandated and that plaintiff does not wear the head dress "all the time" detracts not at all from the conclusion that such practices are protected by the First Amendment to the United States Constitution and cannot be "misconduct" within the meaning of the statute, so as to deny unemployment benefits."
MESC now appeals to this Court.

III.

A.
Several general premises are not at issue and need be expressed. Those charged to administer our public schools have broad authority with which our law *328 will brook but little interference. See Merchant v. Pearl Municipal Separate School District, 492 So.2d 959, 962 (Miss. 1986); Clinton Municipal Separate School District v. Byrd, 477 So.2d 237, 240-42 (Miss. 1985); Brantley v. Surles, 404 So.2d 1013, 1018 (Miss. 1981). More specifically, public schools have authority to promulgate and enforce a reasonable dress code for faculty, staff and students, provided only that it does not infringe rights otherwise protected and even then the schools may enforce such a code when undergirded by some compelling governmental interest reasonably related to their educational mission, so long as the least restrictive means reasonably available be employed.[3] For example, we have no doubt a school could preclude a Native American Indian teacher from coming to work dressed as an Indian warrior, with full feathered head piece, clad in a loin cloth, war painted, carrying a tomahawk or a Christian teacher emulating Adam before the Fall  as an expression of his religious and cultural heritage.[4]
It is certainly true that insubordination may be grounds for discharge of a public school teacher. Merchant v. Pearl Municipal Separate School District, 492 So.2d 959, 963 (Miss. 1986); Noxubee County Board of Education v. Givens, 481 So.2d 816, 819 (Miss. 1985); Sims v. Holly Springs Municipal Separate School District, 414 So.2d 431, 435 (Miss. 1982). Insubordination is misconduct within the Mississippi Employment Security Law, ordinarily adequate that benefits be denied. Shannon Engineering & Construction, Inc. v. Mississippi Employment Security Commission, 549 So.2d 446 (Miss. 1989).
McGlothin claims an exception to these general premises in the form of her right to free expression, religious or otherwise, secured by Miss. Const. Art. 3, § 13 (1890) and by the First Amendment to the Constitution of the United States, as made enforceable against the states through the Fourteenth Amendment. Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).
In Claiborne County Board of Education v. Martin, 500 So.2d 981 (Miss. 1986), we recognized that
public school employees are entitled to exercise rights protected by the First Amendment to the Constitution of the United States and by Article 3, Section 13 of the Mississippi Constitution of 1890 without fear that their employment will be terminated or adversely affected. Givhan v. Western Line Consolidated School District, 439 U.S. 410, 414, 99 S.Ct. 693, 696, 58 L.Ed.2d 619, 623-24 (1979); Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 283-84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471, 481-82 (1977). School boards in this country have broad authority but none that they may not exercise within the limits of the Constitution. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628, 1637 (1943); Clinton Municipal Separate School District v. Byrd, 477 So.2d 237, 240 (Miss. 1985).
Claiborne County, 500 So.2d at 985. These principles clothe teachers such as McGlothin in all protected forms of expression, religious as well as cultural. See Arnold v. Carpenter, 459 F.2d 939 (7th Cir.1972); Martin v. Davison, 322 F. Supp. 318 (W.D.Pa. 1971); Dawson v. Hillsborough *329 County School Board, 322 F. Supp. 286 (M.D.Fla. 1971). In this state we take quite seriously the free exercise of religious beliefs. In re Brown, 478 So.2d 1033, 1036-39 (Miss. 1985).

B.
Today's context is broader. The Employment Security Law affords a gratuitous benefit generally available to the involuntarily unemployed. The benefit is an entitlement available to all under objective criteria. A state may not deny the benefit on grounds the individual has refused to abandon sincerely held religious beliefs.[5]Frazee v. Illinois Department of Employment Security, 489 U.S. ___, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989); Hobbie v. Unemployment Compensation Appeals Commission of Florida, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). These cases proceed from the more general premise that one may not be forced to forsake religious expression or practice in order to secure a state benefit, unless the state has a compelling interest which overcomes the religious right and pursues this interest by the least restrictive means. Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).
What is a religious belief is often a difficult and delicate question. What is clear is that the question does
not ... turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.
Thomas, 450 U.S. at 714, 101 S.Ct. at 1430, 67 L.Ed.2d at 631. This view draws meaning when we recall the truth Holmes saw is that "every opinion tends to become a law." Lochner v. New York, 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937, 949 (1905). Indeed, we have little need for an amendment protecting free religious exercise except it protects the individual from a state-imposed burden emanating from a general opinion that the individual's beliefs are unacceptable, illogical, inconsistent or incomprehensible.
We are aware of no unemployment benefits cases involving claimants who were discharged for wearing head pieces as a form of religious expression. Goldman v. Weinberger, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), however, is instructive. In Goldman an orthodox Jew challenged an Air Force regulation which prohibited members from wearing headgear while indoors. Officer Goldman's commanding officer instructed that he not wear his yarmulke while in uniform. The Supreme Court upheld the military regulation in a five to four decision, which may only be read as holding that the armed forces are the only arm of the government whose mission and interests are so compelling that this form of protected expression may be curtailed. Had Goldman been a teaching assistant at Whitfield Elementary School and had he been discharged by Principal Nolan and JMSSD, there can be no doubt that the Goldman Court would have held him entitled to unemployment compensation benefits.

IV.
In the end, this case turns on the facts as found by the administrative agency. MESC's core finding was that McGlothin wore head-wraps as a form of both religious and cultural expression. These findings are supported by substantial evidence and are well beyond our authority to disturb. Miss. Code Ann. § 71-5-531 (1972); Melody Manor, Inc. v. McLeod, 511 So.2d 1383, 1385 (Miss. 1987); Mississippi Employment Security Commission v. Sellers, 505 So.2d 281, 283 (Miss. 1987); Piggly Wiggly of Bay Springs v. Mississippi Employment Security
*330 Commission, 465 So.2d 1062, 1065 (Miss. 1985).
There are further findings of fact before us and in these MESC finds three escapes from the law's mandate. First, we are told that there is no specific tenet of the African Hebrew Israelites mandating that women wear headdress. First Amendment protections, however, do not turn on whether the claimant's conduct or form of expression has been mandated by doctrine or teaching of a particular religious organization or denomination, nor is it necessarily of concern that members of the particular faith may disagree with claimant's interpretation of church dogma. Thomas v. Review Board of Indiana Employment Security Commission, 450 U.S. 707, 715-16, 101 S.Ct. 1425, 1430-31, 67 L.Ed.2d 624, 632 (1981). What  and all  that maybe required are that the belief have a religious grounding and that the individual be expressing "sincerely held religious beliefs." Frazee, 489 U.S. at ___, 109 S.Ct. at 1517, 103 L.Ed.2d at 920.[6]
Second, it is no defense that McGlothin may not be a regular participant in the organized activities of a particular church, synagogue or other religious body, although there is such a group in Jackson  the House of Israel Hebrew Cultural Center. McGlothin testified, however, "I don't meet with a group on a regular basis." Frazee recognized a right to unemployment benefits by one who refused to work on Sunday, notwithstanding that claimant was not a member of any church congregation and did not attend worship services on Sunday.
Third, it is of little or no relevance that McGlothin may have been "selective in wearing the traditional head-wrap," that at times she did not wear it, else those who are backsliders would be without First Amendment protections. She must show only that she was sincere at the time, and this she has shown. Indeed, no one suggests McGlothin is less than sincere in her beliefs. That she would risk her job is tangible testament to McGlothin's sincerity.
MESC' oral argument conceded sincerity,[7] arguing rather that McGlothin's beliefs, sincere though they be, are not sufficiently religious in nature to enjoy First Amendment protection. The outer limits of the protections at issue were restated in Frazee that an asserted belief might be "so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause." 489 U.S. at ___, n. 2, 109 S.Ct. at 1517-18, n. 2, 103 L.Ed.2d at 919-20, n. 2 citing Thomas v. Review Board, 450 U.S. 707, 715, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981). We regard it common knowledge that millions of women (and some men) around the world cover their heads as a matter of religious and cultural custom. See Rule 201, Miss.R.Ev. We dare say this is among the most widespread of all religious and cultural traditions, transcending race, geography and socio-economic status. It is well within the "outer limits". That the etiology of McGlothin's practice is not exclusively religious is similarly of no concern. Many religious practices have a cultural component, particularly in the eyes of non-practitioners.
*331 In this case the school shared governance committee adopted the dress code, but no reason was given. The letter from Principal Nolan to McGlothin asserted that the head-wrap set a bad example for the children and would undermine McGlothin's ability to teach health and hygiene. Nothing in the record supports the charge. McGlothin wore her head wrap for two years at McLeod Elementary School and without incident. There is no evidence that any other school within JMSSD attempts to prohibit such a practice. McGlothin testified that at least ten other employees at Whitfield wore head-wraps, but we are given no further details of their experience or their fate. Nothing before us in fact establishes that McGlothin's head-wrap had any adverse impact on the student, on McGlothin's job performance, or on the school's educational mission.
School policies and those who implement them often teach as lastingly as teachers in the classroom. In West Virginia Board of Education v. Barnette, 319 U.S. 624, 631, 640-41, 63 S.Ct. 1178, 1186-87, 87 L.Ed. 1628 (1943) wisely observes: "That they are educating the young for citizenship is reason for scrupulous protection of constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." Bethel School District v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986) reminds us that, among the fundamental values schools are supposed to teach, are "tolerance of divergent political and religious views."
Without further ado, we hold that the facts found by the MESC show that McGlothin's conduct was constitutionally protected religious and cultural expression. U.S. Const., Amdts. I and XIV; Miss. Const. Art. 3, § 13 (1890). As such, MESC had no authority to deny her claim for unemployment compensation benefits, this even though that conduct may have been misconduct had it not been constitutionally protected expression.
AFFIRMED.
HAWKINS, P.J., and PRATHER, ANDERSON and PITTMAN, JJ., concur.
DAN M. LEE, P.J., dissents by separate written opinion, joined by ROY NOBLE LEE, C.J.
BLASS, J., dissents by separate written opinion, joined by ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and SULLIVAN, J.
DAN M. LEE, Presiding Justice, dissenting:
This case involves "the difficult duty of distinguishing between religious and secular convictions and ... determining whether a professed belief is sincerely held." Frazee v. Illinois Department of Employment Security, 489 U.S. ___, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989). At issue is our review of the denial of government benefits in the face of a claim of unconstitutional encroachment upon the free exercise of religious beliefs.

I.
McGlothin was discharged from her teaching position at a public elementary school because she wore head-wraps in direct defiance of the rules and directives of the school officials. She claims that her conduct was constitutionally protected by the First Amendment and therefore, she is entitled to unemployment benefits.
A hearing to adjudicate McGlothin's claim was held before an MESC referee. In light of McGlothin's assertions, it was the referee's duty to ascertain that there was "ample predicate for invoking the Free Exercise Clause." Frazee, at ___, ___, 109 S.Ct. 1514, 1517, 103 L.Ed.2d 914, 919 (1989). The burden of proving that the conduct in question was entitled to constitutional protection rested with McGlothin. See Claiborne County Board of Education v. Martin, 500 So.2d 981 (Miss. 1986). To meet this burden it was incumbent on McGlothin to show that her actions were rooted in a sincere religious belief which motivated her conduct. See Bowen v. Roy, 476 U.S. 693, 703, 106 S.Ct. 2147, 2154, 90 L.Ed.2d 735 (1986); Hobbie v. Unemployment *332 Appeals Commission of Florida, 480 U.S. 136, 144 n. 9, 107 S.Ct. 1046, 1051 n. 9, 94 L.Ed.2d 190 (1986); Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 715, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981). An examination of the proof McGlothin offered to meet this burden is in order.
McGlothin testified at the hearing to the following: McGlothin does not belong to any organized religious body, however, she is a member of the original African Hebrew Israelites of Ethiopia. She attends services, or meets with a group associated with the African Hebrew Israelites, sporadically. There is no mandate of the African Hebrew Israelites or the Ethiopian culture for women to cover their heads. She stopped wearing a headdress to class when the school governance committee implemented a dress code forbidding the wearing of bluejeans and headdresses. She attended a multi-cultural workshop in the month of January, 1987 and resumed wearing a headdress on occasion. February, 1987 was Black History Month at the school. At the request of the school officials she actively participated in the presentation of materials to the students which included the presentation of skits relating to the African culture. As program director of the skits, McGlothin would wear, without objection, a headdress on the days the skits were presented. Thereafter McGlothin continued to wear a headdress, but only when she felt like it, until her dismissal for insubordination statutorally defined as "misconduct." Her reasons for wearing a headdress were many: because it created a sense of well-being; it gave her a feeling of strength; it was a form of expression that she chose to exercise for health reasons; it helped give her some sense of identity; it was a personal preference. It was only when the wearing of the headdress became an issue that McGlothin expressed the conduct's relation to some religious ideas.
At the close of the hearing the MESC referee affirmed the decision of the Claims Examiner who had initially found McGlothin disqualified for benefits under § 71-5-513 A(1)(b). The pertinent parts of the referee's decision is as follows:
Based upon the record and testimony, the Referee finds as follows:
FINDINGS OF FACT: Claimant was employed four years as an assistant teacher with the Jackson Public Schools, Jackson, Mississippi, ending March 17, 1987 when discharged for insubordination. She was discharged because she continued to wear head-wraps after numerous discussions with the principal, advising that her attire was not considered appropriate professional dress for teachers and assistant teachers. The local shared governance committee, comprised of school personnel and parents had ruled that jeans and head-wraps were inappropriate dress. Claimant wears berets and head dresses as an expression of her religious and cultural heritage. The custom is not dictated by the Ethiopian Culture, but is claimant's preference in expressing her ancestry. Claimant admits she does not wear the head-wrap at all times, but is selective in choosing when to put it on. After prior warnings by the principal, claimant discontinued the practice. She resumed the practice after attending a multi-cultural workshop sponsored by the schools.
OPINION: Section 71-5-513A(1)(b) of the Law provides that an individual shall be disqualified for benefits for the week or fraction thereof which immediately follows the day on which she was discharged for misconduct connection with the work, if so found by the Commission, and for each week thereafter until she has earned remuneration for personal services equal to not less than eight (8) times her weekly benefit amount as determined in each case.
The term "misconduct" as used in the Mississippi Employment Security Law is usually defined as an act of wanton or wilful disregard of the employer's interest, a deliberate violation of the employer's rules, as disregard of the standard of behavior which an employer has the right to expect of an employee, or negligence *333 indicating an intentional disregard of the employer's interest or of the employee's duties and obligations to the employer.
In the opinion of the Referee, by claimant's own admission, she is selective in wearing the traditional head-wrap which she continued to wear after being warned that it was not considered professional attire. Claimant's discharge was for actions which constitute misconduct connection with the work as defined in the Law. The decision of the Claims Examiner is in order.
DECISION: Affirmed.
The foregoing decision was adopted by the MESC Board of Review and reversed on appeal by the Circuit Court of the First Judicial District of Hinds County which made a finding that McGlothin's conduct was constitutionally protected. We are now asked to review that decision.

II.
When dealing with decisions of the MESC, the standard of judicial review is narrow: "[T]he findings of the board of review as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law." § 71-5-531 (emphasis added). This standard of judicial review is applicable to both the Circuit Court and this Court. Melody Manor, Inc. v. McLeod, 511 So.2d 1383 (Miss. 1987); Mississippi Employment Security Commission v. Sellers, 505 So.2d 281 (Miss. 1987); Mississippi Unemployment Compensation Commission v. Avent, 192 Miss. 85, 4 So.2d 296 (1941).
As the majority aptly points out, "McGlothin claims an exception" to § 71-5-513 A(1)(b) "in the form of her right to free expression, religious or otherwise, secured by Miss. Const. Art. 3, § 13 (1890 and by the First Amendment to the Constitution of the United States." (majority at 328). The majority then eloquently, and correctly, expounds on the law as it relates to conflicts between government action and sincerely held religious beliefs. I submit, however, that the majority has missed the first step in the analysis and ignored our standard of review in reaching its decision. For these reasons, I must respectfully dissent.

III.
This case does not involve whether McGlothin's beliefs were religious in nature; it deals with the sincerity of those beliefs. Sincerity of belief is a question of fact left to the fact finder, not a question of law to be decided on review. As articulated by the United States Supreme Court in the case of United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965):
Local board and courts ... are not free to reject beliefs because they consider them "incomprehensible." Their task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious.
But we hasten to emphasize that while the "truth" of a belief is not open to question, there remains the significant question whether it is "truly held." This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact  a prime consideration to the validity of every claim for exemption... .
Id. at 184-85, 85 S.Ct. at 863-65 (emphasis added). Accordingly, it was the duty of the MESC referee, as the fact finder, to initially determine whether McGlothin's claims were sincere.

IV.
In the case sub judice the MESC referee considered all the evidence presented and made a finding that McGlothin was not entitled to benefits, a finding that was upheld by the Commission. The opinion of the referee and commission do not use the magic words, "We find McGlothin's claim to be insincere," but that clearly was the ultimate result. If anything, the opinion and findings of the referee and Commission are ambiguous on this point.
The majority pulls one sentence from the findings of the referee upon which to base *334 its opinion. However, the entire majority opinion rests on the assumption that McGlothin's beliefs were sincere, when, in fact, no such finding was specifically made. While it is true that when there is a failure to make findings of fact, we will assume that those issues were resolved in favor of the Appellee, MESC, at the circuit court level, Bryant v. Cameron, 473 So.2d 174, 179 (Miss. 1985), I do not believe we are faced with a failure to make a finding in this case; rather, we are faced with ambiguous findings.
On review, we must look at the actions of the Commission and, if supported by evidence, we must affirm; we are not at liberty to view the case from the viewpoint of the Claimant. We are not the fact finders, nor are we free to substitute our opinion for that of the fact finder. Culbreath v. Johnson, 427 So.2d 705, 708 (Miss. 1983). Given the posture of the findings by the referee and Commission in this case, it is clear to me that the majority has ignored our scope of review and is substituting its opinion for that of the fact finder. In keeping with our scope of review, I would reverse the Circuit Court. For that reason, I must respectfully dissent.
ROY NOBLE LEE, C.J., joins this dissent.
BLASS, Justice, dissenting:
I regret that I cannot subscribe to the Court's opinion. The First Amendment of the Constitution of the United States is being made here the subject of debate in the course of a dispute over whether a teacher's aide may wear a headwrap in the classroom when school regulations prohibit it, an issue which, in my judgment, has nothing whatever to do with appellant's free exercise of her religion.
As late as April 27, 1988, the Supreme Court of the United States said:
There is no absolute "constitutional right to unemployment benefits on the part of all persons whose religious convictions are the cause of their unemployment." Sherbert v. Verner, 374 U.S. 398, 409-410, 83 S.Ct. 1790, 1797, 10 L.Ed.2d 965 (1963). On three separate occasions we have held that an employee who is required to choose between fidelity to religious belief and cessation of work may not be denied unemployment compensation because he or she is faithful to the tenets of his or her church. As we explained in Sherbert:

Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against the appellant for her Saturday worship. Id. at 404, 83 S.Ct. at 1794.
Employment Division, et al. v. Smith, 485 U.S. 660, 108 S.Ct. 1444, 99 L.Ed.2d 753 (1988).
This language describes an earnest and genuine conflict between law and religion, indicating the gravity of the situation to which the constitutional guaranty is addressed. In my opinion, the employee here has not been required to choose between fidelity to her religious belief and cessation of work. Indeed, according to the record and the findings by which we are bound, she makes no such claim. She says, in effect, that when she chooses to wear the prohibited headdress she does so as an expression of her heritage, religious and cultural. She does not even claim that the wearing of the headdress was a religious act. When the school authorities, by regulation, determined that headwraps not be worn in the school, the reasonableness of which regulation is not challenged, this teacher's aide chose to defy the authorities and she was fired. I find no such confrontation as is described in Smith. One need only read the First Amendment. Any relation between the language there and the facts here is purely imaginary. Here there is no burden placed upon appellant's fidelity to her religious belief or the free exercise of her religion.
There is nothing demeaning about requiring that citizens respect regulations imposed by duly and legally constituted authority. We have a choice between this and anarchy. An examination of our docket clearly shows that we have gone far enough in this direction.
I respectfully dissent.
*335 ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and SULLIVAN, J., join this opinion.
NOTES
[1] George Terry, JMSSD's Director of Classified Personnel Services, offered more details on the shared governance committee:

A. * * * a committee composed of employees and other persons of the school environment who establish procedures and rules and so on regarding the particular matters. In this case, according to the records, the shared governance committee had devised a dress code that was implemented at the school.
Q. And when was this, did the committee meet and devise the dress code?
A. I do not have the exact dates of that meeting. I understand that it was during this school term somewhere between August 28th and March 17th, and I do not know the exact date of that meeting nor when the dress code in itself was established, but my understanding was that it happened during this school term.
Q. It was just for this school only, or these ...
A. This particular committee as a, what we call a local shared governance committee representing Whitfield Elementary School.
* * * * * *
A. The basic composition of a shared governance committee consists of administrators, in this case, .. . it would be the principal, certified personnel, usually represented by teachers, classified personnel usually represented by custodial, food service, instructional which consisted of teacher aides, teacher assistants, and clerical, which consisted of secretaries and also parents ...
* * * * * *
A. Each school, each organization or entity has a local shared governance committee
* * * * * *
A. The, the usual subject matter that's dealt with by shared governance committees comes from issues, concerns and problems that may be generated from any of the parties representing a school and that may usually have some bearing upon the operation of the school. I cannot say that this particular proceeding was designed to deal specifically with the McGlothin issue. I think perhaps that the, the topic may have come about as an appropriate topic for discussion, rather than as one to deal specifically with an individual, or an individual after that time.
Q. Okay, after they developed some guidelines, what were done with these guidelines?
A. The usual procedure for a shared governance committee is to submit to, I believe the superintendents, a record of its proceedings and also to disseminate that report to each individual on the staff, both certified and non certified, and also to inform the parent body, usually through PTA. That is the usual procedure for informing the school community of the actions of the shared governance committee.
[2] JMSSD has no district-wide employee dress code.
[3] By way of illustration, see Menora v. Illinois High School Athletic Ass'n, 683 F.2d 1030 (7th Cir.1982). At issue was the Association's rule proscribing players' wearing head gear in high school basketball games. The compelling interest was safety. Moshe Menora, a practicing Orthodox Jew and obviously a basketball player of no inconsiderable ability sought to wear his yarmulke. To an Orthodox Jew, not covering the male head is an affront to God. The Court recognized the legitimacy of the asserted safety interest but found the brush too broad. Menora, 683 F.2d at 1035-36. The matter was ultimately resolved by requiring Orthodox Jewish players to wear a securely fastened head covering, which both complied with religious law and obviated safety concerns. McConnell and Posner, An Economic Approach to Issues of Religious Freedom, 56 U. of Chi.L.Rev. 1, 43 (1989).
[4] But cf. New Rider v. Board of Education of Independent School District No. 1, 414 U.S. 1097, 94 S.Ct. 733, 38 L.Ed.2d 556 (1973) (Douglas and Marshall, JJ., dissenting).
[5] We assume, without deciding, that there may be cases in which the school district's interest may be so compelling that it could of right discharge an employee where nevertheless the state would have no authority to withhold unemployment compensation benefits.
[6] State v. Hershberger, 444 N.W.2d 282, 286-87 (Minn. 1989) (Statute requiring display of slow-moving vehicle inapplicable to Amish defendants on grounds of violation of free exercise "although not all adherents regarded the display as violative of the Amish precepts.); Dupont v. Employment Division, 80 Or. App. 776, 723 P.2d 1073 (1986) (Unemployment benefits could not be denied to woman discharged after she missed work to attend religious convention important to her personal well-being on basis it was a sincere religiously motivated action.); Key State Bank v. Adams, 138 Mich. App. 607, 360 N.W.2d 909 (1984) (Although bank had legitimate business reason for employees to work on Saturday, state could not condition payment of unemployment benefits.).
[7] At oral argument MESC's counsel represented to the Court regarding McGlothin's beliefs:

We believe they were sincere. They were something. They touched on the spiritual, if you will, but they were not ... rooted in religion... .
Later counsel argued, "as sincere as this claimant was," her beliefs were outside Sherbert, Thomas, Hobbie and Frazee, for in those cases, according to counsel, the Justices "were thinking in loftier terms."