# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 95-CA-00960-SCT

*PRO-CHOICE MISSISSIPPI, ON BEHALF OF
ITSELF AND ITS MEMBERS, JOSEPH BOOKER,
M.D., TOM TVEDTEN, M.D. AND NEW WOMAN
MEDICAL CENTER*

*v.*

*KIRK FORDICE, GOVERNOR OF THE STATE OF
MISSISSIPPI AND HIS EMPLOYEES, AGENTS
AND SUCCESSORS; MIKE MOORE, ATTORNEY
GENERAL OF THE STATE OF MISSISSIPPI AND
HIS EMPLOYEES, AGENTS AND SUCCESSORS;
AND MISSISSIPPI STATE DEPARTMENT OF
HEALTH*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/30/95 |
| TRIAL JUDGE: | HON. PAT WISE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | CATHERINE ALBRISA |
| | KATHERINE KOLBERT |
| | ROBERT B. McDUFF |
| ATTORNEYS FOR APPELLEES: | MICHAEL B. WALLACE |
| | ROBERT T. HIGGINBOTHAM |
| | T. HUNT COLE, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 08/13/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/3/98 |

**EN BANC.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The original opinions in this case are withdrawn and these opinions are substituted therefor.

## PART ONE

## BACKGROUND--FEDERAL LITIGATION

¶2. On June 27, 1986, Helen Barnes, M.D., Henry Thomas Gunter, M.D., Mississippi Women's Medical Clinic, New Woman Medical Center (Jackson) and New Woman Medical Center (Bay St. Louis) challenged the facial constitutionality of the parental consent abortion statutes, Miss. Code Ann. §§ 41-41-51 through 41-41-63. They sued Bill Allain, then Governor of Mississippi; Edwin Pittman, then Attorney General of Mississippi; the State Board of Medical Licensure, including its members; and the Justices of the Mississippi Supreme Court. The challenge was tried before Judge Henry T. Wingate of the United States Federal District Court for the Southern District of Mississippi. Judge Wingate granted a preliminary injunction enjoining enforcement of the laws until the Mississippi Supreme Court could promulgate rules on parental consent waiver proceedings. The district court also stayed the proceedings for four years, awaiting the outcome of various United States Supreme Court rulings on abortion. Finally, in March 1992, Judge Wingate held that M.R.A.P. 48 (governing appeals from consent waiver proceedings) was unduly restrictive and impaired a minor's access to an abortion. Judge Wingate denied the State's motion to lift the preliminary injunction on enforcement of the challenged statutes. The State appealed to the Fifth Circuit Court of Appeals, who found that the abortion statutes were constitutional in *Barnes v. Mississippi*, 992 F.2d 1335 (5th Cir. 1993), *cert. denied*, 510 U.S. 976 (1993) (*Barnes II*).

¶3. Citing *Bellotti v. Baird*, 443 U.S. 622 (1979), and *Hodgson v. Minnesota*, 497 U.S. 417 (1990), the Fifth Circuit found that a two-parent consent statute with an adequate judicial bypass met federal constitutional muster. Relying on the plurality opinion in *Bellotti*, the Court concluded that "if the statute had contained an adequate judicial bypass the four members of the plurality stood ready to uphold it. A fifth, Justice White, was prepared to uphold the statute in *Bellotti* even without a judicial bypass." *Barnes II*, 992 F.2d at D.K. In *Hodgson*, five Justices "viewed *Bellotti* as settling the question in favor of the constitutionality of a two-parent consent/judicial bypass statute." *Id*. at 1339. The *Barnes II* Court concluded that Mississippi's two-parent consent law did not place an "undue burden" on a minor's right to seek an abortion. *Id*. at 1341.

¶4. The plaintiffs claimed that, even though the statutory judicial bypass might meet constitutional standards, Uniform Chancery Court Rule 10.01, which implements the statute, does not. The Court felt that the contention was hyper-technical and that U.C.C.R. 10.01 was not violative of the Constitution. *Barnes II*, 992 F.2d at 1342.

¶5. On May 21, 1991, Mississippi Women's Medical Clinic and New Woman Medical Center, joined by Joseph Booker, M.D., Helen Barnes, M.D., and Joseph Mitchell, M.D., filed suit against Attorney General Mike Moore in the United States District for the Southern District of Mississippi to enjoin enforcement of the Informed Consent Act, alleging facial violations of both the United States and Mississippi Constitutions. The district court, on August 30, two days before the act was to become effective, granted an injunction suspending the effective date of enforcement. *Barnes v. Moore*, 970 F.2d 12, 13 (5th Cir. 1992) (*Barnes I*).

¶6. While the appeal was pending, the United States Supreme Court handed down *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). The Fifth Circuit determined that Mississippi's laws were similar to the Pennsylvania laws which the United States Supreme Court ruled facially constitutional in *Casey*. *Barnes I*, 970 F.2d at 14-15. Applying the

undue burden standard announced in *Casey*, the Fifth Circuit determined that the differences between the Mississippi and Pennsylvania laws were not sufficient to render Mississippi's laws facially unconstitutional. *Id*. at 15.

## STATEMENT OF THE CASE AND FACTS

¶7. After the facial constitutional challenges in federal court failed, a new group of plaintiffs (hereinafter Plaintiffs) filed a complaint on February 17, 1994, in the Hinds County Chancery Court, contending that certain Mississippi abortion laws violate the Mississippi Constitution. The original plaintiffs in this proceeding were Pro-Choice Mississippi, Joseph Booker, M.D., Tom Tvedten, M.D., Mississippi Women's Medical Clinic, and New Woman Medical Center. Mississippi Women's Medical Clinic was voluntarily dismissed from the proceedings.

¶8. Pro-Choice is a coalition of individuals and organizations committed to the preservation of reproductive rights for all Mississippians. Its member organizations include Planned Parenthood of Mississippi, League of Women Voters of Mississippi, the Mississippi Chapter of the National Organization for Women, and the American Civil Liberties Union of Mississippi.

¶9. Joseph Booker, M.D., is a physician licensed to practice medicine in Mississippi and California, specializing in gynecology. He completed a residency in obstetrics/gynecology at Kaiser Foundation Hospital/Martin Luther King Hospital in Los Angeles, California in 1978, and is currently a member of the Mississippi State Medical Association, the Coast County Medical Association, and the American Medical Association. As the medical director of Gulf Coast Women's Clinic in Gulfport, Dr. Booker asserts his own interests and the interests of his patients, whom he alleges are irreparably harmed by the challenged statutory scheme.

¶10. Tom Tvedten, M.D., is a physician licensed to practice medicine in Arkansas and Mississippi, and temporarily licensed to practice in Alaska. He never completed an American Medical Association-approved residency in obstetrics/gynecology. Dr. Tvedten would like to provide abortion services at the New Woman Medical Center in Jackson but for the challenged licensing restriction.

¶11. New Woman Medical Center in Jackson, Mississippi provides a wide range of health care, including abortions. New Woman has faced great difficulties in recruiting physicians to perform abortions. New Woman asserts its own interests and the interests of its patients.

¶12. The defendants are Kirk Fordice, Governor of Mississippi, Mike Moore, Attorney General of Mississippi, and the Mississippi State Department of Health. On May 15, 1996, an *amicus curiae* brief was filed supporting the State's position. The *amici* include Ronnie Musgrove, Lieutenant Governor of Mississippi, Eric Clark, Mississippi Secretary of State, and various members of the Mississippi Legislature.

¶13. Specifically, Plaintiffs argue that the following are unconstitutional: Miss. Code Ann. § 41-41-31 et seq. (1993) (requiring a twenty-four hour waiting period after state-mandated consultation on information pertaining to abortion and pregnancy before a woman may have an abortion); Miss. Code Ann. §§ 41-41-51 through 41-41-63 (1993), Miss. R. App. P. 48, and U.C.C.R. 10.01 (requiring minors, with a limited exception, to obtain consent of both parents prior to having an abortion); and Rules and Regulations for the Operation of Ambulatory Surgical Facilities and Abortion Facilities

§ 102.19 (requiring a physician to have completed an American Medical Association approved residency in obstetrics and gynecology before performing abortions at a licensed abortion clinic).

¶14. Plaintiffs sought both declaratory and permanent injunctive relief on the grounds that each of the restrictions violates rights guaranteed by Article III, §§ 6, 14, and 32 of the Mississippi Constitution of 1890, including the right to privacy, the right of bodily integrity, the right to make medical decisions free from governmental interference, freedom of conscience, the right to due process of law, and the right to safety. Additionally, Plaintiffs allege that the two-parent consent law and the mandatory delay/State-mandated information law violate the right to free speech as guaranteed by Article III, § 13, and the guarantee against vague punitive laws provided for in Article III, § 14. Plaintiffs also assert that the licensing restriction violates the state constitutional due process guarantee to equal protection of the law and against arbitrary and irrational laws provided for in Article III, §§ 32 and 14 of the Mississippi Constitution.

¶15. Both parties filed motions for summary judgment, and the State asserted the affirmative defenses of lack of standing, lack of jurisdiction, improper joinder, and res judicata. On August 30, 1995, Chancellor Patricia Wise granted the State's motion for summary judgment, finding that the Mississippi Constitution contains a specific right to abortion but that the statutes were constitutional.

## STATEMENT OF THE LAW

### Standard of Review

¶16. This Court will utilize the following standard of review:

> The standard for reviewing the granting or the denying of summary judgment is the same standard as is employed by the trial court under Rule 56(c). This Court conducts de novo review of orders granting or denying summary judgment and looks at all the evidentiary matters before it--admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise, the motion should be denied. Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party. That is, the non-movant would be given the benefit of the doubt.

*Aetna Casualty and Surety Co. v. Berry*, 669 So.2d 56, 70 (Miss. 1996) (*quoting Mantachie Nat. Gas v. Miss. Valley Gas Co.*, 594 So.2d 1170, 1172 (Miss.1992)).

## I.

### DID THE CHANCELLOR CORRECTLY DETERMINE THAT MISSISSIPPI'S CONSTITUTION PROVIDES A RIGHT TO ABORTION?

¶17. The State contends that the Mississippi Constitution does not protect a right to abortion, because the framers of the Constitution did not intend to create a right to abortion. They point out that abortion was illegal at the time the Mississippi Constitution of 1890 was drafted, so the framers

would not have found it necessary to proscribe a right that did not exist. Alternatively, the State argues that even if abortion had been legal at the time the Constitution was drafted, merely because abortion was legal in 1890 does not, *ipso facto*, determine that a right to abortion is actually protected. The State also asserts that since the Constitution does not grant a specific right to abortion, the judiciary may not create one.

## A. Illegality Argument

¶18. Citing the Revised Code of 1880, the State contends that at the time the Constitution was drafted, abortion was illegal in Mississippi.

> Every person who shall administer to any woman pregnant with a **quick child**, any medicine, drug, or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall have been necessary to preserve the life of such mother, or shall have been advised by a physician to be necessary for such purpose, shall be deemed guilty of manslaughter.

Miss. Code 1880, Sec. 2884 (emphasis added). The State posits that the same basic provision was brought forward, pursuant to § 274 of the Constitution of 1890, in § 1157 of the Mississippi Code of 1892. They argue that Miss. Code Ann. § 97-3-3 (1994), which makes a person criminally liable for performing an abortion, unless (a) necessary to preserve the mother's life, or (b) when the pregnancy was caused by rape, announces Mississippi's policy that abortion is not a protected right but is criminally sanctioned in many cases. *But see* **Spears v. State**, 278 So.2d 443 (Miss. 1973) (holding that the limited exceptions in subsections 1(a) and (b) of what is now Miss. Code Ann. § 97-3-3 (1994) make the statute unconstitutional). The State further asserts that this Court has sanctioned criminal action against doctors performing abortions. *See* **McCaskill v. State**, 227 So.2d 847 (Miss. 1969); **Mississippi State Board of Health v. Johnson**, 197 Miss. 417, 19 So.2d 445 (1944) (abortion illegally administered because woman's life not endangered); **Smith v. State**, 112 Miss. 802, 73 So. 793 (1917) (doctor criminally charged with attempting to abort unborn quick child) (*overruled on other grounds by* **Ladnier v. State**, 155 Miss. 348, 351, 124 So. 432, 432 (1929)). Citing **Miller v. State**, 636 So.2d 391 (Miss. 1994), the State concludes that the right to privacy does not protect an act otherwise prohibited by state law. *See* **Miller**, 636 So.2d at 394 ("[N]o right of privacy attaches to sexual acts committed with children, who have been illegally supplied with alcohol.").

¶19. We are not required to metaphysically enter the minds of the Constitution's framers in order to make an interpretation from their viewpoint. "It is a mistake to suppose that a constitution is to be interpreted only in the light of things as they existed at the time of its adoption." **Stepp v. State**, 202 Miss. 725, 729, 32 So.2d 447, 447 (Miss. 1947).

¶20. In asserting that the Mississippi Constitution does not protect the right to abortion under the privacy clause because the framers believed abortion illegal, the State fails to take into account some very important considerations. The monumental United States Supreme Court abortion case, **_Roe v. Wade_, 410 U.S. 113 (1973)**, discussed the legality of abortion from ancient Greece to the present day. "It is undisputed that at common law, abortion performed before 'quickening'-- the first recognizable movement of the fetus in utero, appearing usually from the 16th to the 18th week of pregnancy-- was not an indictable offense." **_Roe_, 410 U.S. at 132**. Thus, prior to 'quickening,' the

fetus was considered part of the mother, and destroying a fetus did not fit within the definition of homicide. *Id*. at 134. Legislation began to replace common law in the area of abortion after the War Between the States. *Id*. at 139. "Most of these initial statutes dealt severely with abortion after quickening but were lenient with it before quickening." *Id*. In *Roe* the Court observed that "throughout the major portion of the 19th century, abortion was viewed with less disfavor than under most American statutes currently in effect." *Id*. at 140. By the end of the 1950's, however, a large majority of jurisdictions banned abortion unless performed in order to preserve the mother's life. *Id*. at 139.

¶21. The State claims that abortion was illegal when the 1890 Constitution was drafted, citing § 2884 of the Revised Code of 1880, *supra*. However, the statute only rendered abortion illegal after the child was "quick." "Quick child" is defined as "pregnant with a child whose fetal movements are recognizable." Stedman's Medical Dictionary, 1304 (25th ed. 1990), which occurs "sometime between 16 and 20 weeks after the onset of the last menstrual period. . . ." F. Gary Cunningham, Williams Obstetrics 218 (17th ed., 1985). Thus, at the time the Mississippi Constitution was adopted, abortion was legal until quickening, some four to five months into pregnancy. This Court in 1898, stated, "'An infant in the mother's womb, not being *in rerum natura*, is not considered as a person who can be killed within the description of murder. . . .'" *State v. Prude*, 76 Miss. 543, 544, 24 So. 871, 871 (1898) (citations omitted). The State's illegality argument, that the framers intended to preclude protection of abortion, is without merit.

### B. Argument on the Lack of an Explicit Guarantee

¶22. The State maintains that the Constitution must be interpreted in light of the circumstances surrounding the framers at the time of adoption. In determining whether "school" in section 208 of the Constitution refers to public schools or state owned and supported schools, this Court stated:

> The subject-matter in the mind of the Convention which adopted the Constitution must be ascertained from the words used in the Constitution, their context, the purpose sought to be accomplished, and the circumstances surrounding the Convention at the time the Constitution was framed and adopted . . .

*State Teachers' College v. Morris*, 165 Miss. 758, 765, 144 So. 374, 377 (1932). In determining whether a new abortion statute (defining the death of a mother resulting from an illegal abortion as murder) violated § 61 of the Constitution, this Court stated, "In construing constitutional provisions, the courts should look to the history of the times and examine the state of things in existence when the Constitutional provision in question was adopted, in order to ascertain the mischief sought to be remedied." *McCaskill v. State*, 227 So.2d 847, 850 (Miss. 1969) (*quoting Hart v. Backstrom*, 148 Miss. 13, 113 So. 898 (1927)). The State contends that Mississippi's Constitution does not protect any right to abortion, because abortion is not mentioned in the Constitution.

¶23. The State argues that this Court will overstep the powers of the judiciary if we declare that Mississippi's Constitution provides for a right to abortion. They assert that reading rights into the Constitution that are not explicitly stated therein is equivalent to amending the Constitution. Only the people of Mississippi may amend the Constitution. *Chevron U.S.A., Inc. v. State*, 578 So.2d 644, 649 (Miss. 1991). In *Chevron* this Court stated that the Constitution:

should not be changed, expanded or extended beyond its settled intent and meaning by any court to meet daily changes in the mores, manners, habits, or thinking of the people. The power to alter is the power to erase. Such changes should be made by those authorized so to do by the instrument itself-- the people.

*Chevron*, 578 So.2d at 649 (*quoting* **State v. Hall**, 187 So.2d 861, 863 (Miss.1966)). The chancellor in **Chevron** solved a conflict concerning oil and gas mineral leases on sixteenth section land through equity, avoiding a constitutional provision. However, in **Chevron**, we were called upon to enforce an article explicitly written into our Constitution and overrule the chancellor's equitable decision. Regardless of the result, this Court must enforce the articles of the Constitution as written. The Mississippi Constitution does not explicitly deny or grant the right to an abortion. However, in **In re Brown**, 478 So.2d 1033 (Miss. 1985), this Court determined that the State Constitution provided for a right to privacy and the right to one's choices concerning one's body, despite the Constitution's silence on that issue.

¶24. The State argues that even if abortion was legal at the time that the Constitution of 1890 was written, the legality of abortion does not equate to a protected right. *See* **Stepp v. State**, 202 Miss. 725, 32 So.2d 447 (1947). In **Stepp**, the defendant was convicted of having intoxicating liquor in his possession. **Stepp**, 202 Miss. at 728, 32 So.2d at 447. Stepp argued that the statute under which he was convicted violated § 32 of the Mississippi Constitution of 1890. *Id*. at 729, 32 So.2d at 447. He asserted that at the time the Constitution was adopted, persons had a right to possess intoxicating liquor. *Id*. Stepp contended that legislation outlawing possession of an intoxicating liquor, enacted after passage of the Constitution, was unconstitutional since the right was inherently protected under § 32. *Id*.

[A] constitution is intended to endure for a long time, and is interpreted in the light of developments which have appeared at the time of the interpretation, and may therefore include things and conditions which not only did not exist but were not contemplated when it was drafted, so long as the new developments are in their nature within the scope of the purposes and powers for the furtherance of which the constitution was established.

*Id*. Pointing out that laws prohibiting the sale of liquor had existed and been upheld for fifty or more years, this Court upheld the statute, finding that a law preventing personal use was reasonably related to the purpose of enforcing Mississippi statutes prohibiting the sale of liquor. *Id*. at 730-31, 32 So.2d at 448. We reaffirmed that decision on Stepp's suggestion of error. **Stepp v. State**, 202 Miss. 725, 731-36, 33 So.2d 307, 307-308 (1948). "The mere fact that possession was not expressly outlawed before the Constitution of 1890, and was not therein treated does not, ipso facto, make the possession of intoxicating liquors protected by Section 32 of the Constitution . . ." *Id*. at 732, 33 So.2d at 308.

¶25. Citing **Stepp**, the State argues that the mere legality of abortion in 1890 does not, *ipso facto*, effect a right to abortion. Furthermore, since the State has for a considerable time regulated aspects of abortion, § 32 does not preclude the State from continuing to regulate abortions if the laws reasonably uphold the State's legitimate interest in protecting the health of its citizens.

¶26. The State is correct in asserting that its police power extends to protecting the health of its citizens. However, the State's police power rises to an unconstitutional level when that power is

exercised in an arbitrary manner. It is also true that merely because an act was legal at the time the Constitution was adopted, that act is not necessarily entitled to constitutional protection. However, our Constitution does recognize a person's right to privacy. We have stated that a right to bodily integrity and autonomy exists within the right to privacy. *In re Brown*, 478 So.2d at 10398-40.

¶27. Article 3, § 32 of the Mississippi Constitution mirrors the Ninth Amendment of the United States Constitution. Article 3, § 32 reads: "The enumeration of rights in this constitution shall not be construed to deny and impair others retained by, and inherent in, the people." The Federal Constitution's failure to explicitly state a right to an abortion has not prevented the United States Supreme Court from perceiving certain "penumbras" from which a protection of privacy is derived. "This right of privacy . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe*, 410 U.S. at 153. Both the Federal and Mississippi Constitutions protect a person's right of privacy to control his/her own person. As this Court stated in *Young v. Jackson*, 572 So.2d 378 (Miss. 1990), "It requires little awareness of personal prejudice and human nature to know that, generally speaking, no aspects of life is [sic] more personal and private than those having to do with one's . . . reproductive system." *Young*, 572 So.2d at 382.

¶28. Chancellor Wise determined that Article 3, § 32 of the Mississippi Constitution provided for the right to an abortion. "The positive law of this state affords each person a substantial zone of freedom which, at his election, he may keep private. The zone surrounds person and place and without his consent may not be invaded by other persons, or by the state." *Young*, 572 So.2d at 381 (internal citations omitted). The right to privacy, whether founded in common law or natural law, is constitutionally guaranteed under Article 3, § 32 of the Mississippi Constitution. *Miller v. State*, 636 So.2d 391, 394 (Miss. 1994); *In re Brown*, 478 So.2d at 1040.

¶29. In *In re Brown*, we determined that the state constitutional right to privacy prevented the State from compelling a Jehovah's witness, who was a critical witness in a murder trial, to accept blood transfusions which would increase her likelihood for survival. We stated, "Each individual enjoys a right of privacy. Each of us has a right to the inviolability and integrity of our persons, a freedom to choose or a right of bodily self-determination, if you will." *In re Brown*, 478 So.2d at 1039. The right to privacy is "the most comprehensive of rights and the right most valued by civilized man." *Id*. (*quoting* Warren and Brandeis, *The Right To Privacy*, 4 Harv. L.Rev. 193, 195 (1890)). "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Id*. (*quoting* **Union Pacific Railway Co. v. Botsford**, 141 U.S. 250, 251 (1891)). Noting that the protection of one's privacy is subsumed in federal law, this Court recognized the same important right in the Mississippi Constitution. *Id*. at 1039-40.

¶30. While we do not interpret our Constitution as recognizing an explicit right to an abortion, we believe that autonomous bodily integrity is protected under the right to privacy as stated in *In re Brown*. Protected within the right of autonomous bodily integrity is an implicit right to have an abortion. *See also* **American Academy of Pediatrics v. Lungren**, 940 P.2d 797 (Cal. 1997) (State Constitution protects right of woman to choose to have an abortion); **Women of the State of Minnesota by Doe v. Gomez**, 542 N.W.2d 17, 26-27 (Minn. 1995) (right to abortion is included in right to autonomous bodily integrity protected under state constitutional right to privacy); **Hope v.**

*Perales*, 634 N.E.2d 183, 186 (N.Y. 1994) (right to privacy protected under the due process clause of the New York Constitution involves the right to reproductive choice, including the right to an abortion); *Mahaffey v. Attorney General of Michigan*, 1994 WL 394970, slip op. at 7 (Mich.Cir.Ct.) ("State Constitution encompasses a right of privacy, which in turn includes the right to an abortion"); *In re T.W.*, 551 So.2d 1186, 1190-93 (Fla. 1989) (right to an abortion included under explicit state constitutional right to privacy); *In re Quinlan*, 355 A.2d 647, 663 (N.J. 1976) (likening the right to refuse medical treatment to the right to an abortion); *State v. Koome*, 530 P.2d 260, 263 (Wash. 1975) (State Constitution protects right to an abortion under right to privacy). Just as the United States Supreme Court has recognized that the federal constitutional right to privacy protects a woman's right to terminate her pregnancy, we find that the state constitutional right to privacy includes an implied right to choose whether or not to have an abortion.

## II.

### WAS THE TRIAL COURT CORRECT IN APPLYING THE "UNDUE BURDEN" STANDARD INSTEAD OF THE "COMPELLING INTEREST" STANDARD?

¶31. The trial court applied the undue burden standard found in *Casey* to determine whether Mississippi's abortion laws violate the State Constitution. However, Plaintiffs assert that the State may apply a stricter standard for state constitutional review. Plaintiffs contend that Mississippi courts have previously applied the strict scrutiny/compelling state interest standard when analyzing the state constitutional right to privacy. They conclude that under the theory of *stare decisis*, Mississippi courts must always apply the strict scrutiny standard when evaluating privacy rights. However, this Court has not previously interpreted the State Constitution as providing protection of a woman's right to abortion. While this Court on a limited number of occasions has addressed privacy rights, we have never pronounced a standard of review for analyzing the constitutionality of abortion statutes.

¶32. As previously discussed, the *In re Brown* Court described the right to privacy as the most comprehensive and guarded right emanating from the Mississippi Constitution. *In re Brown*, 478 So.2d at 1039. The Court applied a strict scrutiny analysis under which the right to privacy may only be infringed upon in compelling cases of great and imminent public danger. *Id*. at 1040. Plaintiffs also cite *Mississippi Employment Security Comm'n v. McGlothin*, 556 So.2d 324 (Miss. 1990), for the premise that this Court should apply the compelling interest test. Under the compelling interest standard, legislation impinging on a fundamental right is valid, only if it is "undergirded by some compelling government interest reasonably related" to the legislative intent, and is the "least restrictive means reasonably available" to further that interest. *Id*. at 328.

¶33. We have rarely addressed the state constitutional right to privacy in the past. An examination of United States Supreme Court case law will therefore be helpful as a starting point. In 1992, the United States Supreme Court reassessed the proper analysis required in determining the constitutionality of various state abortion regulation laws. In *Casey*, the Supreme Court upheld a woman's right to privacy in determining whether to give birth to a child. *Casey*, 505 U.S. at 845-46. Recalling that the Court in *Roe v. Wade* recognized both a woman's liberty and the State's legitimate interest in protecting potential life, the Court found that the State's interest "has been given too little acknowledgment and implementation by the Court in its subsequent cases." *Id*. at 871. The *Casey* Court stated that the Federal Constitution places limits on a State's right to interfere with a person's

most basic decisions about family, parenthood,[(1)] and bodily integrity.[(2)] *Id*. at 849. However, balancing a woman's right to terminate her pregnancy before viability with the State's "'important and legitimate interest in protecting the potentiality of human life'," the Supreme Court decided on a new standard. *Id*. at 871 (*quoting Roe*, 410 U.S. at 162). The Court recognized that a woman's right to terminate her pregnancy does not prohibit the State from taking steps to ensure that the woman is fully informed of her choice and receives competent medical services. *Id*. at 873-74. "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." *Id*. at 874.

> In our view, the undue burden standard is the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty. . . . A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.

*Id*. at 876-77.

¶34. We find this reasoning to be sound. While we have previously analyzed cases involving the state constitutional right to privacy under a strict scrutiny standard requiring the State to prove a compelling interest, we are not bound to apply that standard in all privacy cases. The abortion issue is much more complex than most cases involving privacy rights. We are placed in the precarious position of both protecting a woman's right to terminate her pregnancy before viability and protecting unborn life. In an attempt to create a workable framework out of these diametrically opposed positions, we adopt the well-reasoned decision in *Casey*, applying the undue burden standard to analyze laws restricting abortion. We do not limit any future application of the strict scrutiny standard for evaluating infringement on a person's right to privacy in other areas.

¶35. To be held constitutional, the State's restrictions must be legitimate and not create an undue burden. "A state-imposed [undue] burden on the exercise of a constitutional right is measured both by its effects and by its character: A burden may be 'undue' either because the burden is too severe or because it lacks a legitimate, rational justification." *Casey*, 505 U.S. at 920 (Stevens, J. concurring in part, dissenting in part). We approve the chancellor's decision to apply an undue burden analysis in this case.

## PART TWO

### PITTMAN, PRESIDING JUSTICE, FOR THE COURT:

### III. DOES MISS. CODE ANN. § 41-41-33 (1993), REQUIRING MANDATORY CONSULTATION AND A TWENTY-FOUR HOUR DELAY, VIOLATE MISSISSIPPI'S CONSTITUTION?

¶36. Miss. Code Ann. § 41-41-33 (1993) requires that a woman receive State-mandated information twenty-four hours before having an abortion. The performing physician is required to disclose his name, the particular medical risks of an abortion, the probable gestation age of the unborn child at the time the abortion is performed, and the medical risks associated with carrying the child to term. The physician or the physician's agent must inform the woman that medical benefits are available for

prenatal care, child birth, and neonatal care; that the father is liable for assistance in childcare even if he has offered to assist with financing the abortion; and that there are various private and public medical services that provide pregnancy prevention counseling and referrals for pregnancy prevention medication or devices. The woman has a right to review materials printed by the State, and the physician or physician's agent must orally inform the woman of these materials which describe the anatomical and physiological characteristics of the unborn child and list agencies that offer alternatives to abortion. Miss. Code Ann. § 41-41-35 (1993). The physician or physician's agent may dissociate himself from the State's materials and comment on the materials as he chooses. Before the abortion procedure, the physician must receive written certification from the woman that the information has been disclosed to her and that she is aware of her right to review the State's material. The disclosure of such material twenty-four hours before the abortion may only be waived in medical emergencies to avoid the death of the woman or prevent peril of immediate or irreversible loss of major bodily functions. *See* Miss. Code Ann. § 41-41-31(b) (1993).

¶37. In **Barnes v. Moore,** 970 F.2d 12 (5th Cir. 1992) (**Barnes I**), the Fifth Circuit held that the Mississippi abortion statute mandating the twenty-four hour waiting period and the disclosure and availability of information was constitutional on its face. **Barnes I,** 970 F.2d at 15. While the laws in **Barnes I** were only facially challenged, the plaintiffs in this case are also attacking the constitutionality of the law as applied.

¶38. Here, plaintiffs maintain that the mandatory consultation and twenty-four hour waiting period present an undue burden that prevents some women from having an abortion. However, the State regulation serves a legitimate purpose - taking measures which allow a woman to make a more informed decision. A legitimate state interest that does not create an unnecessary burden passes the undue burden test and is constitutional. *See **Planned Parenthood of Southeastern Pennsylvania v. Casey,** 505 U.S. 833 (1992)*. "Measures aimed at ensuring that a woman's choice contemplates the consequences for the fetus do not necessarily interfere with the right recognized in **Roe [*v. Wade,* 410 U.S. 113 (1973)**]." **Casey,** 505 U.S. at 873. The United States Supreme Court further held in **Casey,** that the fact that a state regulation of abortion "has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." **Casey** 505 U.S. at 874. "Numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure." **Id.** The undue burden standard is an appropriate means of reconciling a state's interest in human life with a woman's constitutionally protected right to an abortion. **Id.**

¶39. Because the mandatory consultation and twenty-four hour delay ensures that a woman has given thoughtful consideration in deciding whether to obtain an abortion, Miss. Code Ann. § 41-41-33 (1993) does not create an undue burden and is therefore constitutional.

## PART THREE

### SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:

### IV.

### DOES THE TWO-PARENT CONSENT LAW VIOLATE MISSISSIPPI'S CONSTITUTION?

¶40. Subject to significant exceptions, Miss. Code Ann. §§ 41-41-51 through 41-41-63 (1993), require an unemancipated minor to obtain consent of both parents or the approval of the chancery court before obtaining an abortion. In instances where the minor's parents are divorced, unmarried, or separated, then consent of the parent with primary custody of the minor is sufficient. Miss. Code Ann. § 41-41-53(2)(a) (1993). If the minor's parents are married but one of the parents is not available within a reasonable time and manner, then written consent of the available parent is sufficient. Miss. Code Ann. § 41-41-53(2)(b) (1993). If the pregnancy is the result of sexual intercourse between the minor and her natural father, adoptive father, or stepfather, then written consent of the minor's mother is sufficient. Miss. Code Ann. § 41-41-53(2)(c) (1993). Abortions without written parental consent are permitted in cases of medical emergency. Miss. Code Ann. § 41-41-57 (1993).

¶41. The parental consent statutes allow for a judicial bypass through which the chancery court may waive parental consent. § 41-41-53(3) (1993). The minor may represent herself, but the court shall advise her of her right to counsel if she is not already represented. § 41-41-55(2) (1993). The proceeding must be confidential and anonymous, and criminal penalties exist to prevent disclosure of the proceedings. §§ 41-41-55(3) and 41-41-61 (1993). The chancery court must rule upon the application for waiver within seventy-two hours, or the parental consent requirement is waived. § 41-41-55(3) (1993). Parental consent is waived if the court finds 1) the minor is mature and well informed enough to make the abortion decision on her own, or 2) obtaining the abortion would be in the best interests of the minor. § 41-41-55(4) (1993). The minor has the right to an expedited, confidential, and anonymous appeal if the chancery court denies the waiver. § 41-41-55(6) (1993). No filing fee is required. § 41-41-55(7) (1993).

¶42. Pursuant to the statute, the Mississippi Supreme Court promulgated Rule 10.01 of the Uniform Chancery Court Rules. Rule 10.01 outlines the procedural process for obtaining a waiver of parental consent in chancery court. The rule states that the pleadings must allege either 1) that the minor is sufficiently mature and well informed to intelligently decide whether to have an abortion on her own, or 2) that one or both of her parents were engaged in physical, sexual, or emotional abuse against her, or that notification of her parents is not in her best interest.[(3)]

¶43. Citing their supporting affidavits, Plaintiffs contend that abortion is a medically safe procedure for young women, far safer in fact than childbirth. They assert that minors have the cognitive ability to provide fully informed consent. Miss. Code Ann. § 41-41-3(i) (1993) permits any female, regardless of age, to give consent for all medical procedures regarding pregnancy except abortion. An unemancipated minor may consent to surgical and medical treatment if the minor has sufficient intelligence to understand and appreciate the procedure. Miss. Code Ann. § 41-41-3(h) (1993). A minor may give medical consent for her own child. § 41-41-3(b) (1993). Furthermore, a minor may consent to an adoption, Miss. Code Ann. § 93-15-103(2) (1994), which Plaintiffs argue has at least as much impact on a mother's emotional and family welfare as the decision to obtain an abortion. Plaintiffs' position is that the legislature's selective approach to parental involvement in a minor's medical decision making demonstrates the lack of a compelling state interest. They posit that parental consent serves no state interest, because those minors who don't want to involve their parents in their decision won't do so simply because the legislature passes a law requiring it. Instead, they will obtain an out-of-state abortion or delay their decision, placing them in greater risk of medical complications. Plaintiffs claim that required parental consent jeopardizes the health and well-being of young women,

because it can cause a minor to delay the abortion or put herself in a dangerous position if she is from an abusive family.

¶44. Plaintiffs also contend that the judicial bypass option does not cure the problems with required parental consent. They assert that minors are unwilling or feel unable to navigate the court process. Plaintiffs also maintain that the court procedure forces minors to reveal intimate information in a stressful and humiliating setting.

¶45. The United States Supreme Court has addressed the constitutionality of parental notice and consent requirements at length on at least eight occasions. *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976); *Bellotti v. Baird*, 443 U.S. 622 (1979); *H.L. v. Matheson*, 450 U.S. 398 (1981); *Planned Parenthood Ass'n. v. Ashcroft*, 462 U.S. 476 (1983); *Akron v. Akron Center for Reproductive Health*, 462 U.S. 416 (1983); *Hodgson v. Minnesota*, 497 U.S. 417 (1990); *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502 (1990); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). In **Barnes I**, the Mississippi parental consent and judicial bypass statutes survived a facial federal constitutional challenge. **Barnes I**, 970 F.2d at 14-15.

¶46. Minors, as well as adults, possess constitutional rights. Pregnant minors, like pregnant adults, have a protected right to an abortion. Minors are natural persons in the eyes of the law and "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority." *Danforth*, 428 U.S. at 74. "Thus, the constitutional protection against unjustified state intrusion into the process of deciding whether or not to bear a child extends to pregnant minors as well as adult women." *Hodgson*, 497 U.S. at 435. However, we have not afforded minors constitutional protection equal to that of adults. "Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination-- including even . . . the right to come and go at will. They are subject, even as to their physical freedom, to the control of their parents and guardians." *Vernonia School District 47J v. Acton*, 515 U.S. 646, 654 (1995).

¶47. In reviewing a Massachusetts parental consent statute, the United States Supreme Court gave three reasons supporting the conclusion that the constitutional rights of children cannot be equated with those of adults: "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Bellotti*, 443 U.S. at 634. The United States Supreme Court pointed out that "during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them." *Id*. at 635. The guiding role of parents in "teaching, guiding, and inspiring by precept and example is essential to the growth of young people into mature, socially responsible citizens." *Id*. at 638. "[D]eeply rooted in our Nation's history and tradition, is the belief that the parental role implies a substantial measure of authority over one's children." *Id*. We agree that the State's interest in protecting minors and in preserving family unity are worthy objectives.

¶48. In **Bellotti**, the United States Supreme Court concluded that state parental consent laws requiring pregnant minors to obtain consent from one or both of their parents were constitutional if an alternative procedure, such as a judicial bypass, was available for obtaining an abortion without

parental consent. *Id*, at 643. *See also* *Casey*, 505 U.S. at 899; *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502 (1990); *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 462 U.S. 476 (1983). In a judicial bypass proceeding, the pregnant minor is entitled to show either: "1) that she is mature enough and well enough informed to make her abortion decision, . . . or 2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests." *Bellotti*, 443 U.S. at 643-44.

¶49. Plaintiffs argue that state constitutional analysis requires a stricter standard than the Federal Constitution. Plaintiffs rely primarily on *In re T.W.*, 551 So.2d 1186 (Fla. 1989), and *American Academy of Pediatrics v. Lungren*, 32 Cal. Rptr.2d 546 (Cal. Ct. App. 1994) (*Lungren I*). In *Lungren I* and *In re T.W.*, state appellate courts found that parental consent statutes violated an unemancipated minor's right of privacy under their State Constitutions.

¶50. In *In re T.W.*, the Florida Supreme Court ruled that the state parental consent statute violated the Florida Constitution. *In re T.W.*, 551 So.2d at 1196. The Florida Court noted that the right of privacy clause in the Florida Constitution explicitly provides more protection than the Federal Constitution.[(4)] *Id.* at 1192. "Under our Florida Constitution, the state's interest becomes compelling upon viability . . . Viability under Florida law occurs at that point in time when the fetus becomes capable of meaningful life outside the womb through standard medical measures. Under current standards, this point generally occurs upon completion of the second trimester." *Id*. at 1193-94 (*citing* *Webster v. Reproductive Health Services*, 492 U.S. 490, 109 S.Ct. 3040, 3075 n.9 (1989) (Blackmun, J., concurring/dissenting). The Florida Court determined that the parental consent statute failed, "because it intrudes upon the privacy of the pregnant minor from conception to birth." *Id*. at 1194. In reaching this conclusion, the Court noted the lack of a parental consent requirement for minors obtaining other medical care or giving a child up for adoption. *Id*. at 1195. Applying a compelling interest standard, requiring the State to use the least intrusive means in furthering the State's interest, the Florida Supreme Court held that the parental consent statute was unconstitutional. *Id*. at 1192-96.

¶51. Plaintiffs rely heavily on a California Appellate Court case, *Lungren I*. Although *Lungren I* was overruled by the California Supreme Court in *American Academy of Pediatrics v. Lungren*, 912 P.2d 1148 (Cal. 1996) (*Lungren II*), *Lungren II* was recently vacated by the California Supreme Court in *American Academy of Pediatrics v. Lungren*, 940 P.2d 797 (Cal. 1997) (*Lungren III*). The *Lungren III* Court found that California's parental consent law "significantly intrudes upon a fundamental autonomy privacy interest protected by the state privacy clause, and . . . that defendants have failed to establish that the statute's intrusion on this autonomy privacy interest is necessary to serve the interests proffered in support of [the statute]." *Lungren III*, 940 P.2d at 812. The Court determined that under the explicit right to privacy found in the California Constitution, minors are entitled to the same protection as adults. *Id*. at 814. In fact, the Court noted that abortion can be a more important issue for minors than for adults, because "unwanted motherhood may be exceptionally burdensome for a minor.'" *Id*. at 815 (*quoting* *Bellotti II*, 443 U.S. at 642). The Court found that although the interests asserted by the State (protecting the health of minors and the parent-child relationship) were compelling, the parental consent law was not necessary to serve those interests. Citing the danger of delayed abortions, illegal back-alley abortions, medical complications in pregnancy and birth, and possible psychological or physical abuse from some parents, the Court reasoned that the statute could actually hinder the State's interests. *Id*. at 827-28. The Court also

noted the inconsistency of a parental consent requirement for abortion in light of California statutes allowing minors to make other medical decisions without parental consent. *Id*. The Court found that parental consent was not necessary considering a physician's capability in determining whether a minor has the capacity to consent to any medical procedure. *Id*. Applying a compelling interest standard, the Court concluded that the State "failed to demonstrate adequate justification for the statute's intrusion upon a pregnant minor's right of privacy under the California Constitution." *Id*. at 831.

¶52. Neither *In re T.W.* nor *Lungren III* control our decision here. Their persuasive authority is diminished by the fact that both Florida and California have State Constitutions with explicit right to privacy clauses, while Mississippi's Constitution has only an inferred right to privacy. Both the Florida and California Courts have adopted a compelling interest standard for reviewing intrusions upon an individual's right to privacy, whereas we have decided to apply the undue burden standard. We therefore are not required to extend the same amount of protection to minors as the Florida and California Courts deemed necessary under th eir State Constitutions.[(5)]

¶53. We find that Mississippi's two-parent consent law is not too restrictive. The State has a legitimate interest in protecting the health of its minors, and in ensuring that their decisions regarding abortion are well informed and carefully considered. These interests are promulgated by Mississippi's parental consent statutes. Mandatory parental consent does not place an undue burden upon a minor's right to obtain an abortion, particularly in light of the judicial bypass. Those minors who lack the requisite maturity to make the long-impacting decision to have an abortion need their parents' guidance, and those who are able to make a fully informed choice alone have the option of obtaining a waiver of parental consent through the judicial bypass proceeding. "Not only is it difficult to define, let alone determine, maturity, but also the fact that a minor may be very much an adult in some respects does not mean that his or her need and opportunity for growth under parental guidance and discipline have ended." *Bellotti*, 443 U.S. at 643-44 n. 23. Parents, more so than physicians or clinic workers, can provide the emotional and moral support that a minor needs in making the important decision of whether to have an abortion. The judicial bypass cures any burden in cases where the minor is at risk due to an abusive home environment or simply has no real need for parental advisement on the issue. Any delay caused by the law is minimal, because a minor obtaining parental consent may proceed immediately with the abortion procedure, and the judicial bypass decision must be made within seventy-two hours with an expedited appeal when necessary. We therefore find that Mississippi's parental consent law passes the undue burden test for determining state constitutionality.

## V.

### DOES THE LICENSING RESTRICTION VIOLATE MISSISSIPPI'S CONSTITUTION?

¶54. Mississippi law requires abortion facilities to be licensed. "No person as defined in Section 41-7-173, of the Mississippi Code of 1972, acting severally or jointly with any other person, shall establish, conduct, operate or maintain an ambulatory surgical facility or an abortion facility in this state without a license under this chapter." Miss. Code Ann. § 41-75-5 (1993). The power to license is vested in the Mississippi State Department of Health. § 41-75-1(f) (1993). The State Department of Health is also charged with the duty of regulating abortion facilities.

The licensing agency shall adopt, amend, promulgate and enforce rules, regulations and

standards, including classifications, with respect to ambulatory surgical facilities and abortion facilities licensed, or which may be licensed, to further the accomplishment of the purpose of this chapter in protecting and promoting the health, safety and welfare of the public by ensuring adequate care of individuals receiving services from such facilities. The licensing agency also shall adopt, amend, promulgate and enforce rules, regulations and standards with respect to the enforcement of the informed consent requirements of Sections 41-41-31 through 41-41-39 at abortion facilities. Such rules, regulations and standards shall be adopted and promulgated by the licensing agency in accordance with the provisions of Section 25-43-1 et seq., and shall be recorded and indexed in a book to be maintained by the licensing agency in its main office in the State of Mississippi, entitled "Rules and Regulations for Operation of Ambulatory Surgical Facilities and Abortion Facilities." The book shall be open and available to all ambulatory surgical facilities and abortion facilities and the public during regular business hours.

Miss. Code Ann. § 41-75-13 (Supp. 1997).[6] Pursuant to this authority, the State Health Department adopted §§ 102.16 and 102.19, which require that a physician performing an abortion have completed an American Medical Association approved residency in Ob/Gyn in a licensed clinic.

The term "physician" shall mean a person fully licensed by the Mississippi State Board of Medical Licensure to practice medicine and surgery in Mississippi under provisions contained in current state statute. He/she must have completed an American Medical Association approved residency in Ob/Gyn.

§ 102.19. "No termination of pregnancy shall be performed at any time except by a physician." § 102.16. The Department reserved the power to waive these provisions in § 404.1.B, under which the Department may "grant variances as it deems necessary for facilities existing prior to July 1, 1991." § 404.1.B.

¶55. Citing the affidavits supporting their motion for summary judgment, Plaintiffs argue that the restriction limits women's access to abortion in Mississippi for no rational purpose and contrary to accepted medical practice. They contend that over half of the Ob/Gyn residency programs in the nation do not require abortion training, and one third do not even offer abortion training. Plaintiffs assert that the licensing restriction prevents physicians from performing abortions in abortion clinics. Due to the low number of abortion clinics and physicians in Mississippi, the restriction impedes women from obtaining abortions. Plaintiffs point out that only one physician is providing abortions regularly in Mississippi, traveling regularly between Jackson and the Gulf Coast. They claim that the "irrational licensing restriction" has prevented clinics from recruiting additional otherwise competent physicians to provide abortion services. Furthermore, Plaintiffs posit that the restriction is arbitrary and therefore violates due process, because physicians without the required training may perform abortions in hospitals or offices but not in an abortion clinic.

¶56. The chancellor found that the State has the power to police the welfare of its citizens. As part of its policing power, the State may set standards to regulate abortion facilities. "The purpose of this chapter is to protect and promote the public welfare by providing for the development, establishment and enforcement of certain standards in the maintenance and operation of ambulatory surgical facilities and abortion facilities which will ensure safe, sanitary, and reasonably adequate care of individuals in such facilities." Miss. Code Ann. § 41-75-3 (1993). *See also Rayborn v. Mississippi*

*State Board of Dental Examiners*, 601 F.Supp. 537 (S.D. Miss. 1985), *aff'd,* 776 F.2d 530 (5th Cir. 1985) (State has legitimate interest in the policing of medical care). However, the chancellor determined that because Plaintiffs had failed to exhaust the administrative remedies in place, this challenge was not properly before the chancery court, concluding that "the licensing restriction has yet to be tested."

¶57. The State's position is that New Woman Medical Center and Dr. Tvedten should have applied for a variance under § 404.1.B before appealing to the chancery court. Until they apply to the Department for a waiver of the restriction, the State contends that neither party has a claim over which the chancery court has jurisdiction. Section 41-75-11 of the Mississippi Code (1993) governs hearings before the licensing agent, in this case, the State Department of Health. "The licensing agency after notice and opportunity for a hearing to the applicant or licensee is authorized to deny, suspend or revoke a license in any case in which it finds that there has been a substantial failure to comply with the requirements established under this chapter." Miss. Code Ann. § 41-75-11 (1993). In the event of an adverse ruling, § 43-11-23 provides for an appeal to the chancery court pursuant to Miss. Code Ann. § 41-75-23 (1993), which reads in part:

> Any applicant or licensee aggrieved by the decision of the licensing agency after a hearing, may within thirty (30) days after the mailing or serving of notice of the decision as provided in Section 43-11-11, Mississippi Code of 1972, file a notice of appeal to the chancery court of the First Judicial District of Hinds County or in the chancery court of the county in which the institution is located or proposed to be located. Such appeal shall state briefly the nature of the proceedings before the licensing agency and shall specify the order complained of. Any person or entity whose rights may be materially affected by the action of the licensing agency may appear and become a party, or the court may, upon motion, order that any such person or entity be joined as a necessary party.

Miss. Code Ann. § 41-75-23 (1993).

¶58. It has long been settled in Mississippi law that all administrative relief must be exhausted before appealing to the courts. *Everitt v. Lovitt*, 192 So.2d 422, 426 (Miss. 1966). Plaintiffs contend that the Department lacks the power to provide an adequate remedy. However, even when the appellant claims that the complaint is beyond the power and jurisdiction of the administrative agency, the rule of exhaustion still applies. *Everitt*, 192 So.2d at 428. "[I]njunctive proceedings could not be used to test the constitutionality of an administrative agency's action where adequate administrative remedies had not yet been completely exhausted." *Id*. (*citing* **West Brothers, Inc. v. Mississippi Public Service Commission**, 186 So.2d 202 (Miss. 1966)). Even though *Everitt* is a workers' compensation case, we have consistently applied the exhaustion doctrine to attacks on other agencies. *See* **Mississippi Dept. Of Public Safety v. McKnight**, 623 So.2d 249, 252 (Miss. 1993); **Multiple Listing Service of Jackson, Inc. v. Century 21 Cantrell Real Estate, Inc.**, 390 So.2d 982, 983 (Miss. 1980); **Mississippi State Department of Public Safety v. Berry**, 217 So.2d 11, 12 (Miss. 1968). The chancellor correctly found that this issue was not properly before the chancery court. Plaintiffs must first exhaust their administrative remedies before appealing to the chancery court and ultimately to this Court.

**VI.**

**DID THE CHANCELLOR CORRECTLY RULE THAT PLAINTIFFS HAD STANDING TO CHALLENGE THE ABORTION REGULATIONS?**

¶59. On cross appeal, the State contends that the chancellor incorrectly ruled that Plaintiffs had standing to challenge the abortion regulations. On March 6, 1995, the State filed a motion to dismiss on grounds that Plaintiffs lacked standing. On March 27, 1995, the chancery court heard oral argument on the issues of the doctor-patient privilege and the standing of Plaintiffs to assert the rights of patients. The chancellor issued an opinion and order on April 13, 1995. During discovery, Plaintiffs refused to provide the State with the names of patients who have received abortions, based upon the doctor-patient privilege. The chancellor determined that Plaintiffs were not required to provide the State with the names of women who have received abortions. The chancellor also found that Plaintiffs had standing.

¶60. At the hearing, the State argued that Pro-Choice did not have standing because it is an unincorporated association and not a physician. The State also questioned Dr. Booker's standing as a physician arguing on behalf of his patients. They challenged Dr. Tvedten's standing because he does not allege the rights of actual patients, but rather of "would be patients." The State claims that Mississippi women are capable of asserting their own rights. They argue that Plaintiffs have failed to demonstrate "injury separate from or in excess of general public concern." *See* ***Fondren v. State Tax Comm'n***, 350 So.2d 1329, 1332 (Miss. 1977).

¶61. In determining whether Plaintiffs had standing, the chancellor recalled the principle of "*jus tertii.*"

> The aboriginal precept of *jus tertii* standing is that "one may not claim standing . . . to vindicate the constitutional rights of some third party." ***Barrows v. Jackson***, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1952). This limitation is not constitutionally mandated but a rule of self- restraint justified by a prudential concern that courts should not adjudicate constitutional rights unnecessarily and a belief that rights are most effectively asserted by those who can personally claim them. ***Singleton v. Wulff***, 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). In cases where these justifications are inapplicable, the general rule should be excepted and assertion of third party rights permitted. ***Id***.

***Deerfield Medical Center v. Deerfield Beach***, 661 F.2d 328, 333 (5th Cir. 1981). The chancellor noted that if *jus tertii* were taken literally, Pro-Choice and Dr. Booker could not assert the rights of their patients. However, the court noted that *jus tertii* is not inviolate.

> The concern that rights are most effectively asserted by those owning them is sufficiently eased to allow surrogate standing where there are circumstantial assurances of a litigant's effective advocacy of third party rights. ***Barrows v. Jackson***, 346 U.S. at 258, 73 S.Ct. at 1036. Such assurances are provided where the relationship between the state enforced measure, the injury to the litigant and the purpose or effect of the measure naturally compels the litigant to fully and aggressively assert the constitutional claims of the third persons. ***Id***. *See* Tribe, American Constitutional Law § 3-26 (1978). *Jus tertii* standing has been deemed sufficiently "necessary" where the result of litigation as a practical matter might impair the ability of third parties to exercise their constitutional rights, ***Griswold v. Connecticut***, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), or where "it would be difficult if not impossible for persons whose rights

are asserted to present their grievance before any court." ***Barrows v. Jackson***, 346 U.S. at 257, 73 S.Ct. at 1035.

***Deerfeild Medical Center***, 661 F.2d at 333.

¶62. In ***Singleton v. Wulff***, 428 U.S. 106 (1976), two physicians challenged the constitutionality of a Missouri statute excluding abortions that are not "medically indicated" from Medicaid benefit coverage. ***Singleton***, 428 U.S. at 108-110. The State argued that the physicians lacked standing. ***Id***. at 110-11. The Supreme Court considered two factual elements in deciding whether the assertion of *jus tertii* was proper. ***Id***. at 114-16. "The first is the relationship of the litigant to the person whose right he seeks to assert." ***Id***. at 114. The ***Singleton*** Court noted that under ***Griswold v. Connecticut***, 381 U.S. 479 (1965), a physician is allowed to assert the privacy rights of married persons whom he advises based upon the "confidential" relationship. ***Id***. at 115. The Court also cited ***Doe v. Bolton***, 410 U.S. 179, 188-89 (1973), and ***Planned Parenthood of Missouri v. Danforth***, 428 U.S. 52, 62 (1976), to support the premise that physicians may assert the rights of their patients in abortion cases. The second element considered on the issue of *jus tertii* is the ability of the third party to assert his or her own right. ***Id***. at 115-16. "If there is some genuine obstacle to such assertion, however, the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent." ***Id***. at 116. The Court stated, "[T]he constitutionally protected abortion decision is one in which the physician is intimately involved. *See* ***Roe v. Wade***, 410 U.S. at 153-156. Aside from the woman herself, therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision." ***Id***. at 117. The ***Singleton*** Court found several obstacles to a woman asserting her own right to have an abortion, including the desire to keep her decision private and the limited time for obtaining an abortion compared to the time consumed in court proceedings. ***Id***. The Court concluded "that it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision. . . ." ***Id***. at 118.

¶63. Applying the decision in ***Singleton***, the chancellor here remarked, "In the cause today, the relationship between the plaintiffs and the patients is close. The women of Mississippi who choose to abort need access to abortion facilities. They cannot safely secure abortions without the aid of a physician." Noting the various obstacles, such as publicity and timeliness of an abortion claim, the Chancellor remarked, "It needs little prompting to recall that the powerful controversy which swirls around the issue of abortion is enough to deter many women from seeking an abortion. There is a strong possibility that by the time the case is finally adjudicated, the point at issue will have become moot. The better approach then is to allow a physician to assert the abortion rights on behalf of the patient."

¶64. Other courts have concluded that a physician has standing to assert the constitutional rights of the patient. ***Planned Parenthood of Central Missouri v. Danforth***, 428 U.S. 52 (1976); ***Doe v. Bolton***, 410 U.S. 179 (1973); ***Griswold v. Connecticut***, 381 U.S. 479 (1965); ***Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action***, 558 F.2d 861, 865 n. 2 (8th Cir. 1977); ***Friendship Medical Center, Ltd. v. Chicago Board of Health***, 505 F.2d 1141, 1148 (7th Cir. 1974).

¶65. Medical facilities and healthcare clinics have standing to assert a patient's constitutional rights as

well. *See* [*Akron v. Akron Ctr. For Reprod. Health, Inc.*, 462 U.S. 416, 440 n. 30 (1983)](); ***Birth Control Ctrs., Inc. v. Reizen***, 743 F.2d 352, 358 (6th Cir. 1984); ***Am. College of Obstetricians and Gynecologists v. Thornburgh***, 737 F.2d 283, 290 n.6 (3d Cir. 1984), *aff'd*, 476 U.S. 747 (1986); ***Deerfield Medical Ctr. v. Deerfield Beach***, 661 F.2d 328, 333-34 (5th Cir. 1981); ***Friendship Medical Ctr., Ltd. v. Chicago Bd. Of Health***, 505 F.2d 1141, 1147 (7th Cir. 1974) *cert. denied* 420 U.S. 997 (1975); ***Women's Medical Ctr. Of Providence, Inc. v. Roberts***, 512 F.Supp. 316, 322-25 (D.R.I. 1981); ***Planned Parenthood Ass'n of Atlanta Area, Inc. v. Harris***, 670 F.Supp. 971 (N.D.Ga. 1987); ***Pilgrim Medical Group v. N.J. State Bd. Of Medical Examiners***, 613 F.Supp. 837, 848 (D.N.J. 1985); ***Planned Parenthood Affiliates of Ohio v. Rhodes***, 477 F.Supp. 529, 537 n. 6 (S.D. Ohio 1979).

¶66. Citing *In re Brown*, 478 So.2d at 1041, the State contends that a plaintiff may not assert a right on behalf of a third party. Even if the State's interpretation of *In re Brown* were correct, the Supreme Court's decision in *Singleton* would override any contrary state case law. However, *In re Brown* is distinguishable from this case. In *In re Brown*, this Court found that an adult may refuse a blood transfusion for herself based upon religious beliefs. *Id*. at 1040-41. However, an adult may not refuse blood transfusions for a child based upon the same religious beliefs. *Id*. at 1041. The federal cases cited in *In re Brown* involve a parent's right to refuse medical procedures performed on her child and the State's attempt to override that third party choice. *Id*. Here, the third party seeks to protect from State intrusion an individual's right to choose medical procedures, rather than actually exercising the choice on the individual's behalf. In this case the normal standing rules apply, allowing healthcare clinics and physicians standing on behalf of their patients.

¶67. The State challenges the standing of two other parties, Pro-Choice and Dr. Booker. The State argues that Pro-Choice lacks standing at common law, because the legislature has neither explicitly nor implicitly authorized voluntary associations to sue or be sued in Mississippi courts. They cite ***Beta Beta Chapter of Beta Theta Pi Fraternity v. May***, 611 So.2d 889 (Miss. 1992), to support their assertion that an unincorporated association may neither sue nor be sued in its own name. In ***Beta Beta Chapter***, this Court found that social organizations may sue and be sued, because statutes authorize and regulate them. ***Beta Beta Chapter***, 611 So.2d at 894. "'Statutes which recognize the legal entity of such associations, grant them rights, and impose liabilities on them, impliedly authorize them to sue and be sued in their association names.'" *Id*. (*quoting* ***Varnado v. Whitney***, 166 Miss. 663, 669, 147 So. 479, 480 (1933)). Most of the organizations forming Pro-Choice are incorporated organizations entitled to sue and be sued. Following the rationale of ***Singleton***, and in light of the fact that Pro-Choice represents the interests of a large number of women, we find that Pro-Choice has standing in this case.

¶68. Citing ***Mississippi State Tax Comm'n v. Veazey***, 624 So.2d 997 (Miss. 1993), the State argues that while Dr. Booker may have standing as a physician, he has violated the abortion statutes and is therefore barred from receiving any relief. In ***Veazey***, the permit of a package store was suspended for selling liquor to a "prohibited purchaser." We held that the seller who had violated the law could not assert due process rights on behalf of the purchaser. *Id*. at 1001. We fail to see the connection between the liquor store/prohibited purchaser relationship and the doctor/patient relationship. The United States Supreme Court has held that a doctor may assert the constitutional rights of the patient in abortion cases because of the confidential relationship. ***Singleton***, *supra*; ***Bolton***, *supra*; ***Danforth***, *supra*. A liquor store and its customers share only a buyer/seller relationship. Furthermore, if Dr.

Booker has violated the abortion standards, then his standing status is heightened since he has more at stake. The State's challenges to Plaintiffs' standing must fail.

## VII.

## ARE PLAINTIFFS' CLAIMS BARRED BY RES JUDICATA?

¶69. The State asserts that Plaintiffs' claims are barred by res judicata. Specifically, the State contends that Plaintiffs previously challenged the constitutionality of the informed consent and two-parent consent statutes in *Barnes I* and *II*.

¶70. The doctrine of res judicata requires the presence of four identities: "(1) identity of the subject matter of the action, (2) identity of the cause of action, ( 3) identity of the parties to the cause of action, and (4) identity of the quality or character of a person against whom the claim is made." *Dunaway v. W.H. Hopper &Associates, Inc.*, 422 So.2d 749, 751 (Miss. 1982); *Mississippi Employment Security Comm'n v. Georgia-Pacific Corp.*, 394 So.2d 299, 301 (Miss. 1981); *Cowan v. Gulf City Fisheries, Inc.*, 381 So.2d 158, 162 (Miss. 1980); *Standard Oil Co. v. Howell*, 360 So.2d 1200, 1202 (Miss. 1978). If all four identities are present, then the parties are precluded from re-litigating any previously decided issues in a subsequent lawsuit. *Dunaway*, 422 So.2d at 751; *Pray v. Hewitt*, 254 Miss. 20, 24, 179 So.2d 842 (1965); *Golden v. Golden*, 246 Miss. 562, 568, 151 So.2d 598 (1963). Furthermore, res judicata is conclusive not only of what was actually contested in a particular lawsuit, but also all matters that might have been litigated and determined in that suit. *Pray*, 254 Miss. at 24, 179 So.2d at 844. All claims that have been litigated in a prior suit, as well as all claims that should have been litigated in the prior suit, are barred from re-litigation under the doctrine of res judicata. *Johnson v. Howell*, 592 So.2d 998, 1002 (Miss. 1991); *Riley v. Moreland*, 537 So.2d 1348, 1354 (Miss. 1989); *Dunaway,* 422 So.2d at 751. "Where one has a choice of more than one theory of recovery for a given wrong, she may not assert them serially in successive actions but must advance all at once on pain of the bar of res judicata." *Walton v. Bourgeois*, 512 So.2d 698, 702 (Miss. 1987).

¶71. The claims asserted in this cause of action are not the same as those decided in *Barnes I* and *II*. The plaintiffs challenged the statutes under the Federal Constitution in *Barnes I* and *Barnes II*. Here, Plaintiffs challenge the constitutionality of the abortion statutes under the Mississippi Constitution. Even though the *Barnes I* plaintiffs challenged the informed consent law under both the Federal and Mississippi Constitutions, the Fifth Circuit addressed only the federal challenge. Before now, we have never considered whether a right to abortion was protected under the Mississippi Constitution, and if so, what standard we would apply. Furthermore, in both *Barnes I* and *Barnes II*, the constitutional challenges were only facial. In this case, Plaintiffs challenge the laws as applied.

¶72. A federal court may not interpret the State Constitution. We reserve the "sole and absolute right" to interpret the Mississippi Constitution. *Penick v. State*, 440 So.2d 547, 551 (Miss. 1983). While the federal courts are free to determine the constitutionality of abortion statutes based on a federal analysis, the State reserves the right to determine state constitutionality. The *Barnes* Courts had no authority to decide whether the abortion statutes violate the Mississippi Constitution. The doctrine of res judicata, therefore, provides the State no relief from Plaintiffs' claims.

## CONCLUSION

¶73. The chancellor found that the right to an abortion was protected under the right to privacy implicitly found in Mississippi's Constitution. While we affirm the chancellor's conclusion that abortion is protected by the Mississippi Constitution, we emphasize that the Constitution does not explicitly provide protection for a right to abortion. The right to privacy in article III, § 32, of the Mississippi Constitution encompasses the right to autonomous bodily integrity. The right to choose to have an abortion, like many other medical procedures, is included in the right to autonomous bodily integrity. While we do not find the Mississippi Constitution to provide an explicit right to an abortion, abortion is protected within the penumbras of the right to privacy.

¶74. The chancellor held that the "informed consent" laws, both the state mandated information and the twenty-four hour delay, imposed a minor inconvenience on women seeking abortions, but upheld them as constitutional. We agree that distributing the State-mandated information materials does not create an undue burden upon a woman's right to obtain an abortion as long as the materials are neither false nor misleading. We also affirm the chancellor's decision to grant summary judgment in favor of the State regarding the twenty-four hour delay. We find that the twenty-four hour delay serves a legitimate state purpose in ensuring that a woman has given thoughtful consideration in deciding whether to obtain an abortion, and therefore does not create any undue burden.

¶75. The chancellor determined that the two-parent consent law together with the judicial bypass was constitutional. We agree. The parental consent statute serves a legitimate state interest in protecting minors and preserving family unity. The judicial bypass sufficiently safeguards a minor's right to obtain an abortion without creating an undue burden. Therefore, the two-parent consent law with the judicial bypass is constitutional.

¶76. The chancellor decided that the licensing restriction "has yet to be tested." We agree that the licensing restriction challenge was not properly before the chancery court, because Plaintiffs have not exhausted their administrative remedies. Once properly challenged, if it is determined that the restriction creates an undue burden on a woman's right to obtain an abortion, then the licensing restriction should and will be held unconstitutional.

**¶77. AFFIRMED.**

**PART ONE: SULLIVAN, P.J., PRATHER, C.J., PITTMAN, P.J., BANKS, AND McRAE, JJ., CONCUR. SMITH, J., CONCURS IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND MILLS, JJ. WALLER, J., NOT PARTICIPATING.**

**PART TWO: PITTMAN, P.J., PRATHER, C.J., ROBERTS, SMITH AND MILLS, JJ., CONCUR. SMITH, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND MILLS, JJ. SULLIVAN, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS AND McRAE, JJ. WALLER, J., NOT PARTICIPATING.**

**PART THREE: SULLIVAN, P.J., PRATHER, C.J., PITTMAN, P.J., BANKS AND McRAE, JJ., CONCUR. SMITH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND MILLS, JJ. WALLER, J., NOT PARTICIPATING.**

**SULLIVAN, PRESIDING JUSTICE, DISSENTING AS TO PART TWO:**

¶78. I agree with the majority that the State clearly has an interest in encouraging women to learn about the philosophical and social arguments in favor of continuing a pregnancy. The State-mandated information serves a legitimate purpose in educating women before they decide whether to have an abortion and does not create an undue burden. I agree that the portion of § 41-41-33 et seq. requiring disclosure of information to women before the abortion procedure passes the undue burden standard, and is therefore constitutional. However, I disagree with the majority's conclusion regarding the twenty-four hour delay, and therefore must respectfully dissent.

¶79. In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) and *Barnes v. Moore*, 970 F.2d 12 (5th Cir. 1992) (*Barnes I*), cited by the majority, the abortion laws were only tested under a facial challenge. The *Casey* Court implied that abortion laws may be unconstitutional as applied or in different circumstances. "Hence, *on the record before us, and in the context of this facial challenge*, we are not convinced that the 24-hour waiting period constitutes an undue burden." *Casey*, 505 U.S. at 887 (emphasis added). Here, Plaintiffs challenge the state constitutionality of the abortion laws both facially and as applied. Specifically, Plaintiffs contend that the laws create an undue burden that prevents a significant number of women from receiving abortions.

¶80. Plaintiffs maintain that the twenty-four hour waiting period creates an undue burden on low-income women living in rural areas. The chancellor characterized the delay as a mere inconvenience. However, Plaintiffs attempted to prove through multiple affidavits that the restriction precludes a substantial number of women from obtaining abortions altogether, and creates an undue burden due to travel and lodging expenses, child care costs, loss of wages and other compensation, and health risks. Included with Plaintiffs' motion for summary judgment was the affidavit of Dr. Stanley K. Henshaw, Ph.D., Deputy Directory of Research for the Alan Guttmacher Institute (AGI) in New York City. AGI is a nonprofit organization involved in collecting research and data on family planning and abortion in the United States. Plaintiffs also attached the affidavits of Nancy Rogers, Clinical Director of New Woman Medical Center, and Dr. Jane Hodgson, M.D., Clinical Associate Professor in Obstetrics and Gynecology at the University of Minnesota at St. Paul Ramsey Medical Centre.

¶81. The affidavits of Dr. Henshaw, Ms. Rogers, and Dr. Hodgson support Plaintiffs' position that the twenty-four hour delay increases the time and financial burden of obtaining an abortion, particularly for low-income women and women from rural areas who have to travel a long distance to one of the two counties in Mississippi with abortion providers. The statistics in the affidavits reveal that after the law went into effect, the number of Mississippi women obtaining abortions decreased by 13%, indicating that the law has prevented many women from being able to obtain an abortion. Plaintiffs also presented data showing that after the waiting period went into effect, the number of abortions obtained by Mississippi women that were performed in the second trimester increased by 18%, raising significant health concerns. Plaintiffs showed that most women arrive at abortion clinics having already made the decision to terminate their pregnancies, making the mandatory delay irrelevant.

¶82. In determining whether the twenty-four hour waiting period is constitutional, we must look to the class as a whole, but we also must look at how the restriction affects portions of the class. In other words, even if a restriction affects only some women, if the law creates "a substantial obstacle to a woman's choice to undergo an abortion" in that group of women, then "[i]t is an undue burden, and therefore invalid." *Casey*, 505 U.S. at 895. Applying the undue burden standard, the *Casey* Court concluded that a Pennsylvania spousal consent law was unconstitutional. The Court determined that married women comprise only a fraction of the women who obtain abortions. Among married women, only a small number of women obtaining abortions are abused. However, the Court found the spousal consent law unconstitutional based on the small number of women with abusive husbands. *Id*. at 887-898. Applying the same reasoning, even if low-income women and/or women living in rural areas constitute only a small fraction of the number of women obtaining abortions, if the laws create an undue burden on them, then the laws are unconstitutional.

¶83. Plaintiffs presented sufficient evidence in the form of affidavits to create a genuine issue of fact regarding the burden created by the twenty-four hour delay on a woman's right to have an abortion. They properly supported their position that the twenty-four hour delay fails to serve any legitimate purpose and merely hampers a woman from obtaining an abortion. The State only asserts two ways in which the twenty-four delay furthers the State's interest. First, they argue that the delay is a form of coercion that reduces the number of abortions obtained in Mississippi. I do not find this to be a legitimate State interest, in light of our recognition of a right to obtain an abortion. Secondly, the State asserts that the delay ensures that a woman has given thoughtful consideration in deciding whether to obtain an abortion. Plaintiffs have provided sufficient evidence to create a genuine issue of fact on this issue. I would remand this issue to the trial court for determination of whether Mississippi's twenty-four hour delay requirement creates an undue burden on the right of a woman to obtain an abortion.

**BANKS AND McRAE, JJ., JOIN THIS OPINION.**

**SMITH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶84. I concur in results only regarding Issue I. I also agree with the majority regarding Issue II, and Part Two of Issue III, but write further to more fully express my view**,** and join entirely Issues IV and VII. I find myself at odds with the majority as to Issues V and VI therefore, I dissent.

**ISSUE I. DID THE CHANCELLOR CORRECTLY DETERMINE THAT MISSISSIPPI'S CONSTITUTION PROVIDES A RIGHT TO ABORTION?**

¶85. I find no authority in the Mississippi Constitution which would permit an abortion and considering *Roe v. Wade*, 410 U.S. 113 (1973), I would go no further.

**ISSUE III: DOES MISS. CODE ANN. § 41-41-33 (1993), REQUIRING MANDATORY CONSULTATION AND A TWENTY-FOUR HOUR DELAY, VIOLATE MISSISSIPPI'S CONSTITUTION?**

¶86. Although the United States Supreme Court held in *City of Akron v. Akron Ctr. for Reproductive Health, Inc.*, 462 U.S. 416 (1983), that the 24-hour waiting period was **facially** unconstitutional, they later stated in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S.

[833, 885 (1992)](#), "[w]e consider that conclusion to be wrong." They further stated "[t]he idea that important decisions will be more informed and deliberate if they follow some period of reflection does not strike us as unreasonable, particularly where the statute directs that important information become part of the background of the decision." *Casey* 505 U.S. at 885. Consequently, the 24-hour waiting period is not facially unconstitutional. However, plaintiffs contend that the mandatory waiting period constitutes an undue burden **as applied**. In *Casey*, the United States Supreme Court also considered the evidence presented in the district court regarding the effect of the 24-hour waiting period **as applied** and concluded that "[w]e do not doubt that, as the District Court held, the waiting period has the effect of 'increasing the cost and risk of delay of abortions,' . . . but the District Court did not conclude that the increased costs and potential delays amount to **substantial** obstacles." *Id.* at 886.(emphasis added). Likewise, in the case at bar, the chancery court did not conclude that the plaintiffs presented sufficient evidence of substantial obstacles that would constitute an undue burden. Additionally, the chancery court's ruling is in accordance with this Court's decision in *Brown v. Credit Ctr., Inc.*, 444 So. 2d 358 (Miss. 1983).

¶87. In *Brown*, the Court stated "[t]he party opposing the motion [for summary judgment] is required to bring forward **significant** probative evidence demonstrating the existence of the triable issue of fact." *Id.* at 364 (emphasis added). In discussing Miss. R. Civ. P. 56(e) regarding summary judgment, the Court held that "[t]he unmistakable language of the rule provides that **mere denial** is insufficient to create an issue of fact." *Id.* (citation omitted) (emphasis added). The affidavits in the case at bar are **mere assertions** that the 24-hour delay law creates an undue burden and therefore are not sufficient evidence to create an issue of fact. The plaintiffs have not presented any affidavits from women who were actually affected by the law as it was applied to them. Rather, the affidavits are mere assertions that this law **could** affect these women in this manner. The affidavits contain statements alleged to have been made by actual patients but these statements are unsubstantiated and are inadmissible hearsay.

¶88. Plaintiffs further argue that these affidavits must be sufficient because to require a woman to come forth and bring this action on her own behalf would jeopardize her confidentiality, which in turn would effectively halt any possible opposition to the law since no woman is willing to jeopardize her confidentiality. However, if this were true, *Roe v. Wade* and its progeny would never have been decided. As Justice Powell stated in *Singleton* "[o]ur docket regularly contains cases in which women, using pseudonyms, challenge statutes that allegedly infringe their right to exercise the abortion decision." *Singleton v. Wulff*, 428 U.S. 106, 126 (1976) (plurality opinion) (Powell, J., dissenting).

¶89. Even though physicians and clinics have been given standing to oppose abortion laws (see discussion regarding standing), they still must present sufficient evidence to create an issue of fact to withstand summary judgment. Additionally, the legal system requires individuals to sacrifice their confidentiality on a daily basis in order to bring various law suits, such as personal injury and medical malpractice, where the most intimate details of an individual's past medical history is subject to dissection. In spite of the extreme intimacy of the subject matter involved in many of these suits, the plaintiff is still required to show injury in fact. These suits are not allowed to go forward based on affidavits merely asserting that injury could occur if several factors were present. Likewise, the plaintiffs in the case at bar have not shown injury in fact and have not presented sufficient evidence of an undue burden. Consequently, the lower court's decision should be affirmed.

**ISSUE V: DOES THE LICENSING RESTRICTION VIOLATE MISSISSIPPI'S CONSTITUTION?**

¶90. I disagree with the majority's holding that this issue was not properly before the chancery court due to Plaintiff's failure to exhaust all administrative remedies.

¶91. Doctor Tvedton and the Clinics have standing to challenge the licensing restriction in that their challenge is regarding the constitutionality of the regulation and is not a request for a variance.

¶92. Under Mississippi's law, abortion clinics are required to obtain a license from the Mississippi State Department of Health ("Department"). Miss. Code Ann. §§ 41-75-1, 41-75-5 (1993). The Mississippi State Department of Health, as the licensing agency, has statutory authority to deny, revoke, or suspend an abortion clinic's license. Miss. Code Ann. § 41-75-11 (1993). Pursuant to the Mississippi State Department of Health's Minimum Standards of Operation for Abortion Facilities, a physician must have completed a residency in OB/GYN. Part I, § A, 102.19 (amended 1996). These regulations were promulgated pursuant to Mississippi statute. Miss. Ann. Code § 41-75-13 (Supp. 1997).

¶93. As plaintiffs point out, they are not requesting a variance from the regulations but are contending that the regulation is unconstitutional because it applies to doctors performing abortions in abortion clinics but does not apply to doctors performing abortions in private offices and hospitals. The court is better suited than an administrative agency to determine an issue regarding constitutionality.

¶94. Doctor Tvedton is precluded from being employed by the Clinics and the Clinics are precluded from hiring Doctor Tvedton (and other physicians who have not completed a residency in OB/GYN) because of this regulation. Because both Doctor Tvedton and the Clinics have shown injury in fact, they have standing to challenge the constitutionality of this agency regulation. Furthermore, it's out of the Department's purview to decide questions of constitutionality thus the Department is not capable of providing relief by way of the administrative grievance procedure.

¶95. Guidance regarding this issue is found in this Court's decision *Miss. Dept. of Env't Quality v. Weems*, 653 So. 2d 266 (Miss. 1995). In *Weems*, the Court discussed the exhaustion of administrative remedies at length and referred to Davis's treatise, wherein it states "[o]ne need not exhaust administrative remedies that are inadequate. Whenever exhaustion will be futile it is not required." *Weems*, 653 So. 2d at 278 (*quoting* Davis, Administrative Law Treatise, 2d, Vol. 4, § 26:5 p.432 (1983)).

¶96. In the case at bar, the plaintiffs are claiming that the license requirement is unconstitutional since it only applies to doctors performing abortions in facilities licensed as abortion clinics and not to doctors who perform abortions in private offices and hospitals. The record is void of any information regarding whether or not the Department has the authority to regulate abortions performed in private doctor's offices and/or hospitals. This issue should be remanded to the chancery court for a preliminary determination of whether the Department has the authority to regulate abortions performed in private offices and hospitals.

¶97. If the Department does not have this authority, the administrative remedy is inadequate to deal

with the plaintiff's contention and the chancery court should determine whether the regulation is unconstitutional. On the other hand, if the Department does have the authority to regulate abortions performed in private offices and hospitals and they **could** provide adequate relief - either by 1) applying this requirement to all abortions performed in the state of Mississippi regardless of the location, or 2) abolishing the requirement as it pertains only to abortions clinics, or 3) demonstrating to the court that there is a rational basis for the regulation - the plaintiffs should be required to exhaust the administrative remedy procedure.

**ISSUE VI: DID THE CHANCELLOR CORRECTLY RULE THAT PLAINTIFFS HAD STANDING TO CHALLENGE THE ABORTION REGULATIONS?**

¶98. The majority errs in relying on *Singleton v. Wulff* in holding that the doctors and clinics should be allowed to file suit on behalf of their patients in cases involving the right to abortion because of the obstacles to women asserting their own right in this area. They further err in holding that Pro-Choice should also be allowed standing in light of the large number of women it represents and the fact that the organizations forming Pro-Choice are incorporated and therefore entitled to sue and be sued.

**A. DOCTOR BOOKER AND CLINICS HAVE STANDING TO CHALLENGE THE 24-HOUR MANDATORY DELAY STATUTE.**

¶99. Doctor Booker and the clinics have standing to challenge the 24-hour mandatory delay statute. However, their standing is not based on *Singleton*. *Singleton* was a plurality decision in which four Justices held that the women had sufficient opportunity to maintain anonymity while challenging these statutes. As Justice Powell stated "[o]ur docket regularly contains cases in which women, using pseudonyms, challenge statutes that allegedly infringe their right to exercise the abortion decision." *Singleton v. Wulff*, 428 U.S. 106, 126 (1976) (plurality opinion) (Powell, J., dissenting).

¶100. Instead, Doctor Booker and the Clinics have standing because they are subject to criminal sanctions in case of violation. *See Doe v. Bolton*, 410 U.S. 179 (1973).

> The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.

*Id.* at 188. But even if they do have standing, this is not to say that they have met their burden of proving that any woman was in fact unduly burdened by the statute **as applied**.

**B. PRO-CHOICE DOES NOT HAVE STANDING.**

¶101. Pro-Choice is not a corporation in and of itself. The fact that several of its members are corporations does not make it a corporation for purposes of maintaining a suit in state court. The rationale employed to grant the doctors and clinics standing is the fact that they are subject to criminal sanctions in the event of violation, *see Doe v. Bolton*, 410 U.S. 179 (1973) and the intimate relationship between the doctor and patient, *See Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (*citing Roe v. Wade*, 410 U.S. 113, 153-56 (1973)) and the fact that a woman may not obtain an abortion without the doctor, *See Singleton*, 428 U.S. at 117. However, none of these factors are

present in respect to Pro-Choice.

¶102. The majority states that "Pro-Choice is a coalition of individuals and organizations . . ." and goes on to reason that Pro-Choice has standing in this case because: 1) **most** of the organizations forming Pro-Choice are incorporated organizations entitled to sue and be sued; and 2) based on the rationale employed in *Singleton*; and 3) because Pro-Choice represents the interests of a large number of women. However, this rationale does not grant Pro-Choice standing in this matter.

### 1) MOST OF THE ORGANIZATIONS FORMING PRO-CHOICE ARE INCORPORATED ORGANIZATIONS.

¶103. The rationale that Pro-Choice has standing because **most** of its organizations are incorporated is without merit. There is no information contained in the record as to the organizations (incorporated or unincorporated) or individuals who comprise Pro-Choice. Thus, the assertion that **most** of the organizations are incorporated, while it may be true, is wholly unfounded and unsupported by the record. However, even if it were true, there is no case law to support the proposition that a voluntary association may sue and be sued if **most** of its organizations are incorporated.

¶104. Additionally, the majority cites *Beta Beta Chapter of Beta Theta Pi Fraternity v. May*, 611 So. 2d 889 (Miss. 1992) in support of its argument. However, in *Beta*, this Court found that social organizations may sue and be sued, because a statute recognizes their existence as a legal entity.

> In holding that Beta can be sued, this Court is lead [sic] by *Varnado* [v. *Whitney*, 166 Miss. 663, 669, 147 So. 479, 480 (Miss. 1933)]. "Statutes which recognize the legal entity of such associations, grant them rights, and impose liabilities on them, impliedly authorize them to sue and be sued in their association names." *Varnado* at 669, 147 So. at 480. Accordingly, this Court finds that Beta is a suitable entity and that such authority can be implied from the statutes recognizing Beta as a legal entity. Miss. Code Ann. §§ 37-111-1 to -11 (1972).

*Beta*, 611 So. 2d at 894. However, the rationale utilized in *Beta* is not applicable to the case at bar since there is no statute specifically authorizing the formation of Pro-Choice.

### 1) THE RATIONALE EMPLOYED IN *SINGLETON*.

¶105. The rationale employed in *Singleton* was that the unique and intimate relationship between the woman and her physician **uniquely qualified** the doctor to represent the woman's position in court. This unique relationship is not present regarding Pro-Choice.

> The closeness of the relationship is patent, . . .. A woman cannot safely secure an abortion without the aid of a physician, and an impecunious woman cannot easily secure an abortion without the physician's being paid by the State. The woman's exercise of her right to an abortion, whatever its dimension, is therefore necessarily at stake here. Moreover, the constitutionally protected abortion decision is one in which the physician is intimately involved. See Roe v. Wade, 410 U.S., at 153-156, [93 S.Ct. at 726-728]. Aside from the woman herself, therefore, the physician is **uniquely qualified** to litigate the constitutionality of the State's interference with, or discrimination against, that decision.

*Singleton*, 428 U.S. at 117 (emphasis added).

¶106. Pro-Choice does not share the close relationship that the patient and doctor share. Pro-Choice is not intimately involved in the patient's decision to obtain an abortion, nor is the woman precluded from obtaining an abortion without the assistance of Pro-Choice. Thus, the *Singleton* rationale does not apply to Pro-Choice.

### 2) PRO-CHOICE REPRESENTS THE INTERESTS OF A LARGE NUMBER OF WOMEN.

¶107. Likewise, the fact that Pro-Choice represents the interests of a large number of women is not determinative of whether Pro-Choice has standing to sue or be sued in Mississippi. There is no statute or case law to support this proposition.

¶108. Because Pro-Choice does not fit within the rationale asserted by the majority and because it is a **coalition** of **individuals** and organizations (incorporated as well as unincorporated), it must be shown that there is some injury to the Pro-Choice members. *See **In re United States Catholic Conference**, 885 F.2d 1020, 1023 (2d Cir. 1989).

### ISSUE VII: ARE PLAINTIFFS' CLAIMS BARRED BY RES JUDICATA?

¶109. The majority is correct in holding that res judicata does not apply because the previous federal litigation involved federal constitutional challenges and the case at bar involves state constitutional challenges to abortion laws in Mississippi.

¶110. In discussing a criminal prosecution in State court, the United States Supreme Court stated

> [o]ur sole concern with it is to see that no conviction contrary to a valid objection raised under the Fourteenth Amendment is upheld. What the statutes of a State mean, the extent to which any provision may be limited by other Acts or by other parts of the same Act, are questions on which the highest court of the State has the final word. The right to speak this word is one which State courts should jealously maintain and which we should scrupulously observe.

*Musser v. Utah*, 333 U.S. 95, 98, 68 S.Ct. 397, 398 (1948).

¶111. Additionally, this Court stated

> [w]e must . . . reserve for this Court the sole and absolute right to make the final interpretation of our state Constitution and, while of great persuasion, we will not concede that simply because the U.S. Supreme Court may interpret a U.S. Constitutional provision that we must give the same interpretation to essentially the same words in a provision of our state Constitution.

*Penick v. State*, 440 So. 2d 547, 551 (Miss. 1983).

¶112. Plaintiffs challenge the constitutionality of the statutes addressed in the case at bar under the Mississippi Constitution. The *Barnes* decisions were in federal court and addressed the constitutionality of the same statutes under the United States Constitution. *Barnes v. Mississippi*, 992 F.2d 1335 (5[t h] Cir. 1993); *Barnes v. Moore*, 970 F.2d 12 (5th Cir. 1992). As the cases above

indicate the federal court will not interpret a state's statute or a state's constitution where the highest court of that state has not spoken. Thus, the prior litigation does not bar the plaintiffs from challenging the constitutionality of the same statutes under the state constitution.

¶113. I respectfully concur in part and dissent in part.

**ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**

1. *See* ***Carey v. Population Services International***, 431 U.S. 678 (1977); ***Moore v. East Cleveland***, 431 U.S. 494 (1977); ***Eisenstadt v. Baird***, 405 U.S. 438 (1972); ***Loving v. Virginia***, 388 U.S. 1 (1967); ***Griswold v. Connecticut***, 381 U.S. 479 (1965); ***Skinner v. Oklahoma ex rel. Williamson***, 316 U.S. 535 (1942); ***Pierce v. Society of Sisters***, 268 U.S. 510 (1925); ***Meyer v. Nebraska***, 262 U.S. 390 (1923).

2. *See* ***Washington v. Harper***, 494 U.S. 210, 221-222 (1990); ***Winston v. Lee***, 470 U.S. 753 (1985); ***Rochin v. California***, 342 U.S. 165 (1952).

3. The difference in language between the statute and the chancery rule, the "hyper technical claim" in ***Barnes I***, was addressed by the U.S. Supreme Court which held that such distinction had no difference in meaning. *See* ***Lambert v. Wicklund***, __U.S. __, 117 S.Ct. 1169, 1172 (1997) (holding that the difference in language as to "parental notification is not in her best interests" and "abortion [without parental notification] is in her best interests" encompasses no distinction, "underlying our statement was an assumption that a judicial bypass procedure requiring a minor to show that parental notification is not in her best interests is equivalent to a judicial bypass procedure requiring a minor to show that abortion without notification is in her best interests . . .").

4. The clause reads, "Right of privacy. -- Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law." Art. I, § 23, Fla. Const. "The drafters of the amendment rejected the use of the words 'unreasonable' or 'unwarranted' before the phrase 'governmental intrusion' in order to make the privacy right as strong as possible." ***In re T.W.***, 551 So.2d at 1191 (*quoting* ***Winfield v. Division of Pari-Mutuel Wagering***, 477 So.2d 544, 548 (Fla. 1985)).

5. ***In re T.W.*** is further distinguished from this case, because the Florida statute did not contain any exception for emergency or therapeutic abortions, or provide for appointment of an attorney for a minor attempting judicial bypass.

6. The Legislature amended § 41-75-13 in 1996, adding the sentence, "The licensing agency also shall adopt, amend, promulgate and enforce rules, regulations and standards with respect to the enforcement of the informed consent requirements of Sections 41-41-31 through 41-41-39 at abortion facilities."